# Exhibit A



—— **E-D Coat Site Boundaries**

☐ **Parcel Boundaries**



— **E-D Coat Site Boundaries**

☐ **Parcel Boundaries**

# Exhibit B

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of: ) | Docket No. HSA FY 16/17-107 |
| ) | |
| **E-D Coat, Inc.** ) | |
| 715 4th Street ) | IMMINENT AND/OR SUBSTANTIAL |
| Oakland, California ) | ENDANGERMENT |
| ) | DETERMINATION AND ORDER |
| Respondents: ) | AND REMEDIAL ACTION ORDER |
| ) | |
| E-D Coat, Inc. ) | Health and Safety Code |
| ) | Sections 25355.5(a)(1)(B), 25355.5(b)(3) |
| Lisa Rossi, an individual ) | 25358.3, 58009 and 58010 |
| ) | |
| Jerry & Patricia S. Rossi Trust ) | |
| ) | |
| Gerald (Jerry) Rossi, an individual ) | |
| and in his capacity as Trustee of the ) | |
| Jerry & Patricia S. Rossi Trust and ) | |
| Frank and Mildred E. Rossi Trust ) | |
| ) | |
| Patricia Rossi, in her capacity as ) | |
| Trustee of the ) | |
| Jerry & Patricia S. Rossi Trust ) | |
| ) | |
| Frank and Mildred E. Rossi Trust ) | |
| ) | |

## I. INTRODUCTION

1.1 <u>Parties.</u> The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent and/or Substantial Endangerment Determination and Order and Remedial Action Order (Order) to E-D Coat, Inc., a California Corporation; Lisa Rossi, an individual and doing business as E-D Coat, Inc.; Gerald (Jerry) Rossi, an individual and Trustee of the Jerry & Patricia S. Rossi Trust; Patricia Rossi, Trustee of the Jerry & Patricia S. Rossi Trust; and the Frank and Mildred E. Rossi Trust (collectively, Respondents; individually, Respondent).

Unilateral ISE Order
April 24, 2017

.1.2  Property/Site.  This Order applies to the property located at 715, 716, 721, 725, 726, 732 and 734 4ᵗʰ Street, 714 and 718 3ʳᵈ Street, 703, 707, 713, 715 5ᵗʰ Street, 410, 414 and 418 Brush Street, and 407 and 411 Castro Street, Oakland, California 94550.  The property consists of approximately one acre and is identified by Alameda County Assessor's Parcel number(s) (APNs) 1-115-5, 1-115-12, 1-115-13-2, 1-115-13-9, 1-115-15, 1-115-21, 1-115-22, 1-115-24, 1-115-23, 1-115-26, 1-115-29, 1-115-34, 1-115-35, 1-115-36, 1-115-17-1, 1-115-18-1, 1-115-18-2, and 1-115-28, 001-121-27-2.  A map showing the property is attached as Exhibit A.  This Order applies to the property and the areal extent of contamination that resulted from activities on the property (hereinafter, the "Site").

1.3  Jurisdiction.  This Order is issued by DTSC to Respondents pursuant to its authority under Health and Safety Code sections 25358.3, 25355.5(a)(1)(B), 25355.5(b)(3), 58009 and 58010. Respondents are subject to the provisions of Chapters 6.5 and 6.8 of Division 20 of the Health and Safety Code because there has been a release of a hazardous substance on, under, or into the land of the subject site.  Because Respondents engaged in the generation and management of hazardous waste, Respondents are subject to the Hazardous Waste Control Law, Chapter 6.5 of Division 20 of the Health and Safety Code, and its implementing regulations.

Health and Safety Code section 25358.3 authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance.  The order may include, but is not limited to, requiring specific dates by which the nature and extent of a release shall be determined and the site adequately characterized, preparation and submittal of a remedial action plan to DTSC for approval, and completion of a removal or remedial action.

Health and Safety Code section 25355.5(b)(3) authorizes DTSC to expend funds from the Hazardous Substance Account and the Hazardous Substance Cleanup Fund without first taking the actions specified in Health and Safety Code section 25355.5(a), if DTSC determines that removal or remedial action is necessary at a site because there may be an imminent and substantial endangerment to the public health or welfare or to the environment, because of a release or threatened release of a hazardous substance.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically enjoined upon any person, officer, or board, by any law

Unilateral ISE Order
April 24, 2017

2

of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II. FINDINGS OF FACT

DTSC hereby finds:

2.1 Liability of Respondents. Each Respondent is a responsible party or liable person as defined in Health and Safety Code section 25323.5. E-D Coat, Inc. (E-D Coat) is a suspended California corporation that owns a portion of the Site identified as APNs 1-115-12, 1-115-26, and 1-115-27-2. E-D Coat operated a metal plating business at the Site until its corporate status was suspended in February 2016 by the California Secretary of State for failure to pay taxes. E-D Coat has operated at the Site since the business was first incorporated in approximately 1966.

Lisa Rossi is the current operator of the Site and operated the Site during the time when hazardous substances were disposed at the Site. Lisa Rossi is currently doing business as E-D Coat, Inc. Lisa Rossi has been managing, directing, and conducting operations specifically related to hazardous waste management activities. Lisa Rossi has been directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Jerry & Patricia S. Rossi Trust currently owns portions of the Site identified as APNs 1-115-13-2, 1-115-29, 1-115-34, 1-115-35, 1-115-36, 1-115-17-1, and 1-115-18-2. Jerry & Patricia S. Rossi Trust have owned portions of the Site since at least 1999. Jerry Rossi and Patricia S. Rossi are Trustees of the Jerry & Patricia S. Rossi Trust. Prior to 1999, these portions of the Site were owned by the Frank and Mildred E. Rossi Trust.

Jerry Rossi operated the plating business at the Site and operated the Site during the time when hazardous substances were disposed at the Site. Jerry Rossi is the current owner of a portion of the Site known as APNs 1-115-28, 1-121-27-2 and has owned the property since approximately 1977. Jerry Rossi managed, directed, and conducted operations specifically related to hazardous waste management activities. Jerry Rossi was directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Frank and Mildred E. Rossi Trust owns portions of the Site identified as APNs 1-115-18-1, 1-115-5 and 1-115-15. Jerry Rossi is the Trustee of the Frank and Mildred E. Rossi Trust.

2.2. Physical Description of Site. The Site is located at 715, 716, 721, 725, 726, 732, and 734 4th Street; 703, 707, 713, 715 5th Street, 407 and 411 Castro Street; 714 and 718 3rd Street;

Unilateral ISE Order
April 24, 2017

3

and 410, 414 and 418 Brush Street in the City of Oakland, California. The Site is generally bounded by 5th Street to the north, Castro Street to the east, 3rd Street to the South, and Brush Street to the west. Fourth Street divides the Site. A church and residential properties, including at least three single family homes and a multi-family apartment building, border the Site. The Site is currently being used as a U-Haul rental business. A Site Location Map is attached as Exhibit A.

   2.3  Site History and Condition. E-D Coat was incorporated in September 1966. E-D Coat operated as an electroplating facility providing zinc, cadmium, and chromium plating services until approximately 2012. E-D Coat's hazardous materials inventory submitted with local regulators identified the following hazardous materials stored at the Site: sodium hydroxide, nitric acid, hydrochloric acid, hydrofluoric acid, sulfuric acid, zinc, cadmium, and others.

   On or about 1993, E-D Coat, Inc. applied for a permit-by-rule (PBR) under the tiered permitting program in accordance with California Code of Regulations, title 22, section 67450.11 in order to treat hazardous waste generated by onsite plating operations. E-D Coat operated its two PBR units, a heater and filter press. One PBR unit treated wastewater in order to reduce hexavalent chromium to trivalent chromium. The other PBR unit treated cyanide-bearing hazardous waste (zinc cyanide and cadmium cyanide).

   A United States Environmental Protection Agency (USEPA) Region IX Site Screening Checklist for the Site conducted by DTSC in June 1997 identified a potential for a release of hazardous substances, pollutants, or contaminants because of an unpaved floor surface, lack of secondary containment, and possible leaking of drums or tanks.

   In November 1999, USEPA executed a search warrant for suspected unlawful discharge of wastewater to the sewer system, which resulted in criminal convictions against Jerry Rossi and fines.

   In April 2009, the Alameda County District Attorney's Office executed a search warrant based on an a East Bay Municipal Utility District (EBMUD) allegation that metal discharges to the sewer were occurring near the E-D Coat facility, which resulted in EBMUD issuing a complaint and fine.

   In June 2011, EBMUD terminated E-D Coat's wastewater discharge permit because of illegal discharges to the sewer. In March 2012, the Alameda County District Attorney's Office executed a search warrant based on EBMUD allegations of metal discharges to the sewer. Due to various EBMUD violations, including discharge violations, E-D Coat was ordered to cease all operations. E-D Coat ceased its plating operations on or about 2012.

Unilateral ISE Order
April 24, 2017

In July 2015, USEPA and the Alameda County Department of Environmental Health (ACDEH) conducted inspections during 2015 and 2016, noting violations in 2016 related to the corroded condition of tanks and drums at the E-D Coat facility. In March and April 2017, ACDEH issued Notices of Violations related to the 2016 inspections.

On April 19, 2017, the Alameda County District Attorney's Office executed a search warrant at the following six distinct areas of the Site:

1. Location #1: 716 4th Street, Small Rack Line (Line A), Large Rack Line (Line B);
2. Location #2: 407 Castro Street, Warehouse;
3. Location #3: 411 Castro Street, Shipping and Receiving;
4. Location #4: 715&721 4th Street, Old Barrel Line (Line D), Cleaning & Pickling Line (Line E);
5. Location #5: 725 4th Street, New Automatic Line (Line C), Chem Film Line (Line G); and
6. Location #6: 714 & 718 3rd Street, Waste Treatment Yard.

These areas searched are depicted in Exhibit B. Representatives of DTSC, ACDEH, USEPA, and other state and local agencies assisted with the search warrant operations.

Location #4 includes the Old Barrel Line (Line D) and the Cleaning and Pickling Line (Line E), which contains chemical storage areas (made up of drums and other small containers) and multiple plating lines. The line identified as the Old Barrel Line is comprised of approximately sixteen tanks that are heavily corroded and the concrete below the tanks is badly etched and degraded indicating previous releases of plating liquids. Over time, acidic liquids corrode concrete and alkaline liquids leave crystal residues. The Old Barrel Line contains solids and other residues. Another line adjacent to the Old Barrel Line is the Zinc Plating Line. The Zinc Plating Line is comprised of approximately 16 tanks that were heavily corroded and concrete below the tanks are stained and corroded indicating previous releases of plating liquids. The tanks contain varying amounts of liquid solutions and are estimated to contain thousands of gallons of caustic (alkaline) cleaners and zinc (acidic) solutions in total. The roof directly above one of the tanks on the Zinc Plating Line, labeled as "Tank E12, Hydrochloric acid," had collapsed. Tarps covering the hole in the roof are distended, holding approximately 75 gallons of rainwater. Further rain could cause the tarp to overflow into "Tank E12, Hydrochloric Acid," which, in turn, would cause the tank to overflow. Released hydrochloric acid would likely reduce the integrity of surrounding tanks and impact the integrity of the floor. "Tank E 13, Caustic Cleaner," the tank immediately adjacent to "Tank E12, Hydrochloric Acid," contained chemicals incompatible with one another and mixing of the contents could generate extreme heat and potentially release toxic gases.

Unilateral ISE Order
April 24, 2017

Also in Location #4 is the Cleaning and Pickling Line (Line E), which is comprised of approximately seven tanks that contained acidic or caustic (alkaline) solutions. "Tank E33, hydrochloric acid" contains approximately 1,000 gallons of hydrochloric acid solution. Approximately eight feet along the side of Tank E33 is completely corroded through so that there is a large hole in the side of the tank allowing the tank's inner liner to bulge out against the jagged edges of the hole in the tank. The tank liner appears to be aged and worn, and is therefore quite brittle. This tank is at significant risk of immediate failure. If the tank were to fail, the solution would likely corrode the tanks nearby, potentially causing additional releases of various acidic and/or alkaline plating wastes. The nearby tanks that could be impacted contain incompatible solutions, including caustic (alkaline) material. Because there is no secondary containment, the contents would likely flood the entire plating line.

Also in Location #4 is a tank labeled as "E31, Hydrochloric Acid." This tank is old and constructed of wooden boards. The interior liner is collapsing and dry residues along the top edge of the tank indicates the contents do not match the label and instead contain chromic acid. If the liner continued to collapse, the acid solution would immediately seep through the wood, causing damage to the surrounding tanks. The release would accelerate evaporation of the solution, which would cause hexavalent chromium to release to the air. Additionally, a steel I-beam located adjacent to this tank is corroded through at its footing, indicative of past releases of acidic plating liquids, and does not appear to be structurally sound.

Location #6 (Waste Treatment Yard) is a large, open outdoor yard facing 3rd street where approximately 15 hazardous waste treatment tanks are located. There are four underground sumps located in the yard that were part of hazardous waste PBR treatment operations and approximately 30 drums labeled as containing hazardous waste that are covered only with plastic wrap instead of lids. All four sumps are full of liquid, with only a minimal amount of freeboard to allow for further capacity. Further rain might cause the sumps to overflow, releasing the contents to the yard and offsite. Liquid was observed being actively pumped by an electric sump pump from the sumps and released via sprinklers to the concrete floor of the treatment yard. There are at least three locations where soil is exposed and likely impacted by the liquid released from the sprinklers.

Also in Location #6 is a tank that is approximately eleven feet tall and six feet in diameter labeled on the Site Map as "F1, Chrome Reduction." The tank is labeled "Sulfuric Acid – Trace, Chromium Acid – Trace, Nitric Acid – Trace." This tank is badly rusted and the support ladder allowing access to the top of the tank is no longer usable because sections of the ladder are missing due to corrosion. Approximately one-third of the way up the tank, there are pinholes in the side of the tank, allowing the contents to slowly run down the side of the tank to the ground.

Unilateral ISE Order
April 24, 2017

In Location #5, there are two plating lines (New Automatic Line (Line C), Chem Film Line (Line G), which contain a total of approximately 38 tanks. Most tanks have a capacity of approximately 3000 gallons and the majority of the tanks are at least half full and many are completely full. Caustic corrosion residuals on many of the tanks and multi-colored crystals on the floor below the tanks indicate that chemicals have been released. Additionally, various walls and other surfaces, including control panels and an eyewash station adjacent to the tanks, are coated with alkaline crystals.

In Location #1, there are two plating lines identified as Small Rack Line (Line A) and Large Rack Line (Line B). The plating lines include approximately 30 tanks. Some of the tanks contain small amounts of liquids and the majority of the tanks contain solids, sludge and crystals. Also, there is a large amount of crystallization that has built up on the exterior of the tanks and the floor below the tanks. Approximately 25 to 30 feet from Line B, there are two refrigerators. One of the refrigerators contains food. The concrete floor between the two plating lines is extremely corroded which indicates extensive historic releases of plating liquids. One wall that borders the adjacent residential property (724 4th Street) has extensive corrosion and numerous holes, some of which have completely gone through to the other side and have been patched.

Location #2, identified as the Warehouse, appear to be used for storage of U-Haul trucks, other vehicles, large volumes of holiday decorations, and other equipment formerly used in plating operations.

Location #3, identified as Shipping and Receiving, is being used for storage of personal effects, as well as storage of approximately six drums containing unknown chemicals.

2.4 Hazardous Substances Found at the Site. The following hazardous substances have been found at the Site: Acids (hydrochloric acid, hydrofluoric acid, sulfuric acid, chromic acid, and nitric acid), caustic soda, cyanide, and heavy metals such as chromium, cadmium and zinc.

2.5 Health Effects.

2.5.1 Chromium. Chromium compounds in the trivalent state are of a low order of toxicity. In the hexavalent state, chromium compounds are irritants and corrosive, and can enter the body by ingestion, inhalation, and through the skin. Acute exposures to chromium dust or mist may cause coughing and wheezing, headache, dyspnea, pain in deep inhalation, fever, and loss of weight. USEPA has determined that hexavalent chromium in air is a human carcinogen.

2.5.2 Cadmium. Acute and chronic exposure to cadmium in animals and humans results in renal dysfunction, hypertension, anemia, and altered liver microsomal activity,

Unilateral ISE Order
April 24, 2017

According to USEPA, the kidney is considered to be the critical target organ in humans chronically exposed to cadmium by ingestion. USEPA has determined that cadmium in air is a human carcinogen.

2.5.3 Cyanide. Cyanide is readily absorbed through the skin, mucous membrane, and by inhalation. Symptoms of cyanide poisoning include anxiety, confusion, vertigo, nausea, convulsions, paralysis, coma, cardiac arrhythmias, and transient respiratory stimulation followed by respiratory failure.

2.5.4 Chromic Acid. Symptoms of chromic acid exposure include irritation to the respiratory system; nasal septum perforation; liver and kidney damage; leukocytosis (increased blood leukocytes), leukopenia (reduced blood leukocytes), eosinophilia; eye injury; conjunctivitis; and skin ulcer, sensitization dermatitis. Chromic acid is a potential occupational carcinogen (lung cancer).

2.5.5 Hydrochloric Acid. Hydrochloric acid is a highly corrosive material. The presence of acids is indicated by a low pH (less than 7). Hydrochloric acid is highly toxic by ingestion and inhalation. It is a strong irritant to the eyes, skin and mucous membrane. More severe exposures result in pulmonary edema and laryngeal spasm. Concentrations of 1,000-2,000 parts per million (ppm) are dangerous, even for brief exposure.

2.5.6 Hydrofluoric Acid. The dissolved form of hydrogen fluoride is called hydrofluoric acid. Acute inhalation of hydrofluoric acid can cause bronchiolar ulceration, pulmonary hemorrhage and edema, and death. Renal and hepatic damage have been observed in animal studies. The major health effect of chronic inhalation exposure is skeletal fluorosis.

2.5.7 Nitric Acid. Nitric acid exposure may cause irritation or burns to the eyes, skin and mucous membrane; delayed pulmonary edema; pneumonitis, bronchitis; and dental erosion.

2.5.8 Sulfuric Acid. Dermal contact with sulfuric acid will burn skin, and inhalation can result in tooth erosion and respiratory tract irritation. Ingestion of sulfuric acid can cause burns to the mouth, throat, and stomach. Severe exposure can result in death. The International Agency for Research on Cancer (IARC) has determined that occupational exposure to strong inorganic acid mists containing sulfuric acid is carcinogenic to humans. IARC has not classified pure sulfuric acid for its carcinogenic effects.

2.5.9 Caustic Soda. Caustic soda is a strongly alkaline material. The presence of alkaline material is indicated by an elevated pH (greater than 7). Caustic soda is corrosive and has an irritating effect on all body tissue, causing burns and deep ulcerations. Inhalation can cause damage to the upper respiratory tissue and lung tissue, with effects ranging from mucous membrane irritation to severe pneumonitis.

Unilateral ISE Order
April 24, 2017

2.5.10 <u>Zinc.</u> Ingesting high levels of zinc for several months may cause anemia, damage the pancreas, and decrease levels of high-density lipoprotein (HDL) cholesterol. EPA has determined that because of lack of information, zinc is not classifiable as to its human carcinogenity,

2.6 <u>Routes of Exposure.</u> Routes of exposure include direct contact, ingestion, dermal absorption, and inhalation by humans and animals. Due to the deteriorated condition of the pavement covering the Site and because the floor in the plating area was historically unpaved, hazardous substances at the Site may have migrated to soil and contaminated groundwater. The most likely sources of exposure are inhalation or direct contact with airborne contamination that may be dispersed directly from the Site or dispersed by wind or rain from contaminated soil or other surfaces. Groundwater migration is possible; groundwater is located within 10 feet of the ground surface. Unremediated soil currently located under the pavement may have affected groundwater or may remain a source of release to groundwater. Surface water runs to a storm water system in the street that discharges to the Oakland Inner Harbor Channel which is located approximately 2,000 feet away. The Oakland Inner Harbor Channel connects to the San Francisco Bay.

2.7 <u>Public Health and/or Environmental Risk.</u> The Site is currently being used as a U-Haul rental business and there are workers onsite, as well as members of the public that rent U-Hauls from the Site. The area around the Site is mixed residential and industrial. There is a single-family residence and a multi-family apartment building located adjacent to the Site. There are also many residences located across the street from the facility. There is a church located at the corner of Brush St. and 4th St. There are various commercial buildings located near the Site.

## III. CONCLUSIONS OF LAW

3.1 Each Respondent is a responsible party as defined by Health and Safety Code section 25323.5.

3.2 Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

3.3 There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site as defined in Health and Safety Code section 25320.

3.4 The actual and threatened release of hazardous substances at the Site presents an imminent and substantial endangerment to the public health or welfare or to the environment.

3.5 Response action is necessary to protect public health and the environment and to abate a public nuisance.

Unilateral ISE Order
April 24, 2017

## IV.  DETERMINATION

4.1     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that response action is necessary at the Site because there has been a release and/or there is a threatened release of hazardous substances.

4.2     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site.

## V.  ORDER

Based on the foregoing FINDINGS, CONCLUSIONS, AND DETERMINATION, IT IS HEREBY ORDERED THAT Respondents conduct the following response actions in the manner specified herein, and in accordance with a schedule specified by DTSC as follows:

5.1     All response actions taken pursuant to this Order shall be consistent with the requirements of Chapter 6.8 (commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations.

5.1.1  Removal Actions.  Respondents shall undertake removal actions if, during the course of the remedial investigation (RI) or feasibility study (FS), DTSC determines that response actions are necessary to mitigate the release and/or threatened release of hazardous substances at or emanating from the Site.  DTSC may require Respondents to submit a removal action workplan that includes a schedule for implementing the workplan for DTSC's approval. Either DTSC or Respondents may identify the need for removal actions.  Respondents shall also implement the following removal actions:

a.  Respondents shall, under DTSC's oversight, initiate and cause to be performed by a qualified and independent third party, the following activities:

i.   Drainage Control.  Immediately upon the Effective Date of this Order take all necessary drainage control measures to ensure that run-off and run-on are appropriately diverted to reduce migration of hazardous substances off-site and to prevent precipitation of run-off from other sources such as flooding.  This includes, but is not limited to, the following:

1.     All measures necessary to prevent the release of rainwater accumulated in the tarp covering the hole in the roof to Tank E12, Hydrochloric Acid. (Location #4 of Exhibit B).

2.     All measures necessary to prevent the overflow of all outdoor sumps, open-topped tanks, drums, and containers. (Location #6 of Exhibit

Unilateral ISE Order
April 24, 2017

B).

  ii. Removal of Liquids from Sumps and Failing Tanks.

    1. Within ten (10) days of the Effective Date of this Order, Respondents shall submit a Workplan to DTSC that characterizes and provides for the removal of all liquids, debris and other materials from all sumps and tanks at the Site posing an immediate risk of failure or overflow including, but not limited to, the following:

     I. "Tank E12, Hydrochloric acid" (Location #4 of Exhibit B).
     II. "Tank E13, Caustic Cleaner" (Location #4 of Exhibit B).
     III. "Tank E33, Hydrochloric acid" (Location #4 of Exhibit B).
     IV. "Tank E31, Hydrochloric acid" (Location #4 of Exhibit B).
     V. Tank labeled "Sulfuric Acid – Trace, Chromium Acid – Trace, Nitric Acid – Trace" (Location #6 of Exhibit B).
     VI. Four underground sumps (Location #6 of Exhibit B).

    2. Removal of all liquids, debris and other materials from all sumps and tanks at the Site posing an immediate risk of failure or overflow, including the units identified in Section 5.1.1.a.ii.1, above, must be completed to the satisfaction of DTSC within twenty (20) days of the Effective Date of this Order.

  iii. Submission of Hazardous Waste and Hazardous Material Inventory and Workplan with Schedule for Removal

    1. Within 35 days of the Effective Date of this Order, Respondents shall submit to DTSC for review:

     I. An inventory identifying the location, type, and quantity of all hazardous substances located in tanks, sumps, drums, or any other container at the Site. The inventory must identify the proposed final disposition of all material.
     II. A workplan which contains a schedule for removal of all hazardous substances from the Site.

b. DTSC must be provided with sufficient advance written notice of all activities taken in accordance with subsection (a) of this section to allow DTSC to observe and monitor such activities. This includes, but is not limited to: any site walks or inventories with prospective or currently retained consultants or contractors; draining, pumping, repairing or repackaging of any tanks, drums or other containers; and offsite removal of any hazardous substances.

c. Respondents shall conduct all actions required by Section 5.1.1 in compliance with Chapter 6.5 and Chapter 6.8 of Division 20 of the Health and Safety Code and the applicable regulations in Division 4.5 of Title 22 of the California Code of Regulations.

Unilateral ISB Order
April 24, 2017

d. . In the event that Respondents fail to take the actions provided in Section 5.1.1, and DTSC takes the action instead, Respondents shall be subject to penalties and damages specified in Section 9 and shall be liable to DTSC for all costs of the response action as specified in Section 6.18. Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.2  Remedial Investigation/Feasibility Study (RI/FS). An RI/FS shall be conducted for the Site. The RI/FS may be performed as a series of focused RI/FSs, if appropriate, based on Site priorities. The RI/FS shall be prepared consistent with USEPA's "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA," October 1988. The purpose of the RI/FS is to assess Site conditions and to evaluate alternatives to the extent necessary to select a remedy appropriate for the Site. RI and FS activities shall be conducted concurrently and iteratively so that the investigations can be completed expeditiously. Because of the unknown nature of the Site and iterative nature of the RI/FS, additional data requirements and analyses may be identified throughout the process. Respondents shall fulfill additional data and analysis needs identified by DTSC; these additional data and analysis requests will be consistent with the general scope and objectives of this Order.

The following elements of the RI/FS process shall be preliminarily defined in the initial Site scoping and refined and modified as additional information is gathered throughout the RI/FS process.

(a) Conceptual Site Model identifying contamination sources, exposure pathways, and receptors;

(b) Federal, State and local remedial action objectives including applicable legal requirements or relevant and appropriate standards;

(c) Project phasing including the identification of removal actions and operable units;

(d) General response actions and associated remedial technology types; and

(e) The need for treatability studies.

5.2.1  RI/FS Objectives. The objectives of the RI/FS are to:

(a) Determine the nature and full extent of hazardous substance contamination of air, soil, surface water, and groundwater at the Site;

(b) Identify all actual and potential exposure pathways and routes through environmental media;

Unilateral ISE Order
April 24, 2017

12

(c)  Determine the magnitude and probability of actual or potential harm to public health, safety or welfare or to the environment posed by the threatened or actual release of hazardous substances at or from the Site;

(d)  Identify and evaluate appropriate response actions to prevent or minimize future releases and mitigate any releases which have already occurred; and

(e)  Collect and evaluate the information necessary to prepare a remedial action plan (RAP).

5.2.2.  RI/FS Workplan.  Within 30 days from the Effective Date of this Order, Respondents shall prepare and submit to DTSC for review and approval a detailed RI/FS Workplan and implementation schedule which covers all the activities necessary to conduct a complete RI/FS of the Site.

The RI/FS Workplan shall include a detailed description of the tasks to be performed, information or data needed for each task, and the deliverables that will be submitted to DTSC. Either Respondents or DTSC may identify the need for additional work.

These RI/FS Workplan deliverables are discussed in the remainder of this Section, with a schedule for implementation, and monthly reports. The RI/FS Workplan shall include all the sections and address each component listed below.

(a)  Project Management Plan.  The Project Management Plan shall define relationships and responsibilities for major tasks and project management items by Respondents, its contractors, subcontractors, and consultants.  The plan shall include an organization chart with the names and titles of key personnel and a description of their individual responsibilities.

(b)  Scoping Document.  The Scoping Document shall incorporate program goals, program management principles, and expectations contained in the National Contingency Plan (NCP) (40 Code of Federal Regulations (CFR) Part 300), as amended.  It shall include:

(1)  An analysis and summary of the Site background and the physical setting.  At a minimum, the following information is required:

(A)  A map of the Site, and if they exist, aerial photographs and blueprints showing buildings and structures;

(B)  A description of past disposal practices;

Unilateral ISE Order
April 24, 2017

13

(C) A list of all hazardous substances which were disposed, discharged, spilled, treated, stored, transferred, transported, handled or used at the Site, and a description of their estimated volumes, concentrations, and characteristics;

(D) A description of the characteristics of the hazardous substances at the Site; and

(E) If applicable, a description of all current and past manufacturing processes which are or were related to each hazardous substance.

(2) An analysis and summary of previous response actions including a summary of all existing data including air, soil, soil gas, surface water, and groundwater data and the Quality Assurance/Quality Control (QA/QC) procedures which were followed;

(3) Presentation of the Conceptual Site Model;

(4) The scope and objectives of RI/FS activities;

(5) Preliminary identification of possible response actions and the data needed for the evaluation of alternatives. Removal actions shall be proposed, if needed, based on the initial evaluation of threats to public health and the environment. If remedial actions involving treatment can be identified, treatability studies shall be conducted during the characterization phase, unless Respondents and DTSC agree that such studies are unnecessary as set forth in Section 5.4; and

(6) If applicable, initial presentation of the Site Remediation Strategy.

(c) Field Sampling Plan. The Field Sampling Plan shall include:

(1) Sampling objectives, including a brief description of data gaps and how the field sampling plan will address these gaps;

(2) Sample locations, including a map showing these locations, and proposed frequency;

(3) Sample designation or numbering system;

(4) Detailed specification of sampling equipment and procedures;

(5) Sample handling and analysis including preservation methods, shipping requirements and holding times; and

(6) Management plan for wastes generated.

Unilateral ISE Order
April 24, 2017

(d) Quality Assurance Project Plan.  The plan shall include:

(1)  Project organization and responsibilities with respect to sampling and analysis;

(2)  Quality assurance objectives for measurement including accuracy, precision, and method detection limits.  In selecting analytical methods, Respondents shall consider obtaining detection limits at or below potentially applicable legal requirements or relevant and appropriate standards, such as Maximum Contaminant Levels (MCLs) or Maximum Contaminant Level Goals (MCLGs);

(3)  Sampling procedures;

(4)  Sample custody procedures and documentation;

(5)  Field and laboratory calibration procedures;

(6)  Analytical procedures;

(7)  Laboratory to be used certified pursuant to Health and Safety Code section 25198;

(8)  Specific routine procedures used to assess data (precision, accuracy, and completeness) and response actions;

(9)  Reporting procedure for measurement of system performance and data quality;

(10) Data management, data reduction, validation, and reporting.  Information shall be accessible to downloading into DTSC's system; and

(11) Internal quality control.

(e)  Health and Safety Plan.  A site-specific Health and Safety Plan shall be prepared in accordance with federal (29 CFR 1910.120) and state (Title 8 CCR Section 5192) regulations.  This plan should include, at a minimum, the following elements:

(1)  Site Background/History/Workplan;
(2)  Key Personnel and Responsibilities;
(3)  Job Hazard Analysis/Summary;
(4)  Employee Training;
(5)  Personal Protection;
(6)  Medical Surveillance;
(7)  Air Surveillance;

Unilateral ISE Order
April 24, 2017

(8) Site Control;
(9) Decontamination;
(10) Contingency Planning;
(11) Confined Space Operations;
(12) Spill Containment;
(13) Sanitation;
(14) Illumination; and
(15) Other applicable requirements based on the work to be performed.

All contractors and all subcontractors shall be given a copy of the Health and Safety Plan prior to entering the Site. Any supplemental health and safety plans prepared by any subcontractor shall also be prepared in accordance with the regulations and guidance identified above. The prime contractor will be responsible for ensuring that all subcontractor supplemental health and safety plans will follow these regulations and guidelines.

(f) Other Activities. A description of any other significant activities which are appropriate to complete the RI/FS shall be included.

(g) Schedule. A schedule which provides specific time frames and dates for completion of each activity and report conducted or submitted under the RI/FS Workplan including the schedules for removal actions and operable unit activities.

5.2.3 RI/FS Workplan Implementation. Respondents shall implement the approved RI/FS Workplan.

5.2.4 RI/FS Workplan Revisions. If Respondents propose to modify any methods or initiate new activities for which no Field Sampling Plan, Health and Safety Plan, Quality Assurance Project Plan, or other necessary procedures/plans have been established, Respondents shall prepare an addendum to the approved plan(s) for DTSC review and approval prior to modifying the method or initiating new activities.

5.3 Interim Screening and Evaluation of Remedial Technologies. At the request of DTSC, Respondents shall submit an interim document which identifies and evaluates potentially suitable remedial technologies and recommendations for treatability studies.

5.4 Treatability Studies. Treatability testing will be performed by Respondents to develop data for the detailed remedial alternatives. Treatability testing is required to demonstrate the implementability and effectiveness of technologies, unless Respondents can show DTSC that similar data or documentation or information exists. The required deliverables are: a workplan, a sampling and analysis plan, and a treatability evaluation report. To the extent practicable, treatability studies will be proposed and implemented during the latter part of Site

Unilateral ISE Order
April 24, 2017

characterization.

5.5  Remedial Investigation (RI) Report.  The RI Report shall be prepared and submitted by Respondents to DTSC for review and approval in accordance with the approved RI/FS workplan schedule.  The purpose of the RI is to collect data necessary to adequately characterize the Site for the purposes of defining risks to public health and the environment and developing and evaluating effective remedial alternatives.  Site characterization may be conducted in one or more phases to focus sampling efforts and increase the efficiency of the investigation. Respondents shall identify the sources of contamination and define the nature, extent, and volume of the contamination.  Using this information, the contaminant fate and transport shall be evaluated.  The RI Report shall contain:

(a)  Site Physical Characteristics.  Data on the physical characteristics of the Site and surrounding area shall be collected to the extent necessary to define potential transport pathways and receptor populations and to provide sufficient engineering data for development and screening of remedial action alternatives.

(b)  Sources of Contamination.  Contamination sources (including heavily contaminated media) shall be defined.  The data shall include the source locations, type of contaminant, waste characteristics, and Site features related to contaminant migration and human exposure.

(c)  Nature and Extent of Contamination.  Contaminants shall be identified and the horizontal and vertical extent of contamination shall be defined in soil, groundwater, surface water, sediment, air, and biota.  Spatial and temporal trends and the fate and transport of contamination shall be evaluated.

5.6  Baseline Health and Ecological Risk Assessment.  Respondents shall perform health and ecological risk assessments for the Site that meet the requirements of Health and Safety Code section 25356.1.5(b).  Respondents shall submit a Baseline Health and Ecological Risk Assessment Report within thirty (30) days from the approval of the RI Report.  The report shall be prepared consistent with U.S. EPA and California Environmental Protection Agency guidance and regulations, including as a minimum:  Risk Assessment Guidance for Superfund, Volume 1; Human Health Evaluation Manual, December 1989, and as amended; Superfund Exposure Assessment Manual, April 1988, and as amended;  Risk Assessment Guidance for Superfund, Volume 2, Environmental Evaluation Manual, March 1989, and as amended; Supplemental Guidance for Human Health Multimedia Risk Assessments of Hazardous Waste Sites and Permitted Facilities (DTSC, September 1993), and as amended; and all other related or relevant policies, practices and guidelines of the California Environmental Protection Agency and policies, practices and guidelines developed by U.S.EPA pursuant to 40 CFR 300.400 et seq. The Baseline Health and Ecological Risk Assessment Report shall include the following components:

Unilateral ISE Order
April 24, 2017

(a) Contaminant Identification. Characterization data shall identify contaminants of concern for the risk assessment process.

(b) Environmental Evaluation. An ecological assessment consisting of:

(1) Identification of sensitive environments and rare, threatened, or endangered species and their habitats; and

(2) As appropriate, ecological investigations to assess the actual or potential effects on the environment and/or develop remediation criteria.

(c) Exposure Assessment. The objectives of an exposure assessment are to identify actual or potential exposure pathways, to characterize the potentially exposed populations, and to determine the extent of the exposure. Exposed populations may include industrial workers, residents, and subgroups that comprise a meaningful portion of the general population, including, but not limited to, infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations, that are identifiable as being at greater risk of adverse health effects due to exposure to hazardous substances than the general population.

(d) Toxicity Assessment. Respondents shall evaluate the types of adverse health or environmental effects associated with individual and multiple chemical exposures; the relationship between magnitude of exposures and adverse effects; and related uncertainties such as the weight of evidence for a chemical's potential carcinogenicity in humans.

(e) Risk Characterization. Risk characterization shall include the potential risks of adverse health or environmental effects for each of the exposure scenarios derived in the exposure assessment.

5.7 Feasibility Study (FS) Report. The FS Report shall be prepared and submitted by Respondents to DTSC for review and approval, no later than thirty (30) days from submittal of the RI Report. The FS Report shall summarize the results of the FS including the following:

(a) Documentation of all treatability studies conducted.

(b) Development of medium specific or operable unit specific remedial action objectives, including legal requirements and other promulgated standards that are relevant.

(c) Identification and screening of general response actions, remedial technologies, and process options on a medium and/or operable unit specific basis.

Unilateral ISE Order
April 24, 2017

(d) Evaluation of alternatives based on the criteria contained in the NCP, including:

Threshold Criteria:

(1) Overall protection of human health and the environment.

(2) Compliance with legal requirements and other promulgated standards that are relevant.

Primary Balancing Criteria:

(1) Long-term effectiveness and permanence.

(2) Reduction of toxicity, mobility, or volume through treatment.

(3) Short-term effectiveness.

(4) Implementability based on technical and administrative feasibility.

(5) Cost.

Modifying Criteria:

(1) State and local agency acceptance.

(2) Community acceptance.

(e) Proposed remedial actions.

5.8  Public Participation Plan (Community Relations).  Respondents shall work cooperatively with DTSC in providing an opportunity for meaningful public participation in response actions.  Any such public participation activities shall be conducted in accordance with Health and Safety Code sections 25356.1 and 25358.7 and DTSC's most current Public Participation Policy and Guidance Manual, and shall be subject to DTSC's review and approval.

Respondents, in coordination with DTSC, shall conduct a baseline community survey and develop a Public Participation Plan (PPP) which describes how, under this Order, the public and adjoining community will be kept informed of activities conducted at the Site and how Respondents will be responding to inquiries from concerned citizens.  Major steps in developing a PPP are as follows:

Unilateral ISE Order
April 24, 2017

(a) Develop proposed list of interviewees;
(b) Schedule and conduct community interviews; and
(c) Analyze interview notes, and develop objectives.

Respondents shall conduct the baseline community survey and submit the PPP for DTSC's review within forty (40) days of the Effective Date of this Order.

Respondents shall implement any of the public participation support activities identified in the PPP, at the request of DTSC. DTSC retains the right to implement any of these activities independently. These activities include, but are not limited to, development and distribution of fact sheets, public meeting preparations; and development and placement of public notices.

5.9  California Environmental Quality Act (CEQA). DTSC will comply with CEQA for all activities required by this Order that are projects subject to CEQA. Upon DTSC's request, Respondents shall provide DTSC with any information that DTSC deems necessary to facilitate compliance with CEQA. The costs incurred by DTSC in complying with CEQA are response costs and Respondents shall reimburse DTSC for such costs pursuant to Section 6.19.

5.10  Removal Action Workplan (RAW). If DTSC determines a removal action is appropriate, Respondents will prepare and submit no later than thirty (30) days after DTSC's approval of the FS, a draft Removal Action Workplan (RAW) in accordance with Health and Safety Code sections 25323.1 and 25356.1. The Removal Action Workplan will include:

(a)  a description of the onsite contamination;
(b)  the goals to be achieved by the removal action;
(c)  an analysis of the alternative options considered and rejected and the basis for that rejection. This should include a discussion for each alternative which covers its effectiveness, implementability and cost;
(d)  administrative record list;
(e)  a description of the techniques and methods to be used in the removal action, including any excavating, storing, handling, transporting, treating, and disposing of material on or off the site;

(f)  Sampling and Analysis Plan with corresponding Quality Assurance Plan to confirm the effectiveness of the RAW, if applicable;

(g)  a brief overall description of methods that will be employed during the removal action to ensure the health and safety of workers and the public during the removal action. A detailed community air monitoring plan shall be included if requested by DTSC.

Unilateral ISE Order
April 24, 2017

20

In conjunction with DTSC, Respondents shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual. DTSC will prepare a response to the public comments received. If required, the Respondents shall submit within two (2) weeks of the request the information necessary for DTSC to prepare this document.

Following DTSC's finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAW. Respondents shall modify the document in accordance with DTSC's specifications and submit a final RAW within fifteen (15) days of receipt of DTSC's comments.

If the proposed removal action does not meet the requirements of Health and Safety Code section 25356.1(h), the Respondents will prepare a Remedial Action Plan (RAP) in accordance with Health and Safety Code section 25356.1(c) for DTSC review and approval.

5.11  Remedial Action Plan (RAP). No later than thirty (30) days after DTSC approval of the FS Report, Respondents shall prepare and submit to DTSC a draft RAP. The draft RAP shall be consistent with the NCP and Health and Safety Code section 25356.1. The draft RAP public review process may be combined with that of any other documents required by CEQA. The draft RAP shall be based on and summarize the approved RI/FS Reports, and shall clearly set forth:

(a)  Health and safety risks posed by the conditions at the Site.

(b)  The effect of contamination or pollution levels upon present, future, and probable beneficial uses of contaminated, polluted, or threatened resources.

(c)  The effect of alternative remedial action measures on the reasonable availability of groundwater resources for present, future, and probable beneficial uses.

(d)  Site specific characteristics, including the potential for offsite migration of hazardous substances, the surface or subsurface soil, and the hydrogeologic conditions, as well as preexisting background contamination levels.

(e)  Cost-effectiveness of alternative remedial action measures. Land disposal shall not be deemed the most cost-effective measure merely on the basis of lower short-term cost.

(f)  The potential environmental impacts of alternative remedial action measures, including, but not limited to, land disposal of the untreated hazardous substances as opposed to treatment of the hazardous substances to remove or reduce their volume, toxicity, or mobility prior to disposal.

Unilateral ISE Order
April 24, 2017

(g) A statement of reasons setting forth the basis for the removal and remedial actions selected. The statement shall include an evaluation of each proposed alternative submitted and evaluate the consistency of the removal and remedial actions proposed by the plan with the NCP.

(h) A schedule for implementation of all proposed removal and remedial actions.

In conjunction with DTSC, Respondent) shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual. DTSC will prepare a response to the public comments received. If required, the Respondents shall submit, within two (2) weeks of the request, the information necessary for DTSC to prepare this document

Following DTSC's finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAP. Respondent) shall modify the document in accordance with DTSC's specifications and submit a final RAP within fifteen (15) days of receipt of DTSC's comments.

5.12 Remedial Design (RD). Within sixty (60) days after DTSC approval of the final RAP, Respondents shall submit to DTSC for review and approval a RD describing in detail the technical and operational plans for implementation of the final RAP which includes the following elements, as applicable:

(a) Design criteria, process unit and pipe sizing calculations, process diagrams, and final plans and specifications for facilities to be constructed.

(b) Description of equipment used to excavate, handle, and transport contaminated material.

(c) A field sampling and laboratory analysis plan addressing sampling during implementation and to confirm achievement of the performance objectives of the RAP.

(d) A transportation plan identifying routes of travel and final destination of wastes generated and disposed.

(e) For groundwater extraction systems: aquifer test results, capture zone calculations, specifications for extraction and performance monitoring wells, and a plan to demonstrate that capture is achieved.

(f) An updated health and safety plan addressing the implementation activities.

(g) Identification of any necessary permits and agreements.

Unilateral ISE Order
April 24, 2017

(h)  An operation and maintenance plan including any required monitoring.

(i)  A detailed schedule for implementation of the remedial action consistent with the schedule contained in the approved RAP including procurement, mobilization, construction phasing, sampling, facility startup, and testing.

(j)  A community Air Monitoring Plan.

5.13  Land Use Covenant.  If the approved remedy in the final RAP or final RAW includes deed restrictions or land use restrictions, pursuant to California Code of Regulations, title 22, section 67391.1, the current owner(s) of the Site shall sign and record deed restrictions approved by DTSC within ninety (90) days of DTSC's approval of the final RAP.

5.14  Implementation of Final RAP or Final RAW.  Upon DTSC's approval of the RD or final RAW, Respondents shall implement the final RAP or final RAW in accordance with the approved schedule in the RD or final rap.  Within thirty (30) days of completion of field activities, Respondents shall submit an Implementation Report documenting the implementation of the Final RAP and RD or final RAW.

5.15  Operation and Maintenance (O&M).  Respondents shall comply with all O&M requirements in accordance with the final RAP and approved RD or final RAW.  Within thirty (30) days of the date of DTSC's request, Respondents shall prepare and submit to DTSC for approval an O&M plan that includes an implementation schedule.  Respondents shall implement the plan in accordance with the approved schedule.

5.16  Five-Year Review.  Respondent shall review and reevaluate the remedial action after a period of five (5) years from the completion of construction and startup, and every five (5) years thereafter.  The review and reevaluation shall be conducted to determine if human health and the environment are being protected by the remedial action.  Within thirty (30) days before the end of the time period approved by DTSC to review and reevaluate the remedial action, Respondents shall submit a remedial action review workplan to DTSC for review and approval. Within sixty (60) days of DTSC's approval of the workplan, Respondents shall implement the workplan and shall submit a comprehensive report of the results of the remedial action review. The report shall describe the results of all sample analyses, tests and other data generated or received by Respondents and evaluate the adequacy of the implemented remedy in protecting public health, safety, and the environment.  As a result of any review performed under this Section, Respondents may be required to perform additional Work or to modify Work previously performed.

5.17  Changes During Implementation of the Final RAP or Final RAW.  During the implementation of the final RAP and RD or final RAW, DTSC may specify such additions,

Unilateral ISE Order
April 24, 2017

modifications, and revisions to the RD or final RAW as DTSC deems necessary to protect public health and safety or the environment or to implement the final RAP or final RAW.

5.18  Stop Work Order.  In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondents to stop further implementation of this Order for such period of time needed to abate the endangerment.  In the event that DTSC determines that any site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondents to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate.  Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.19  Emergency Response Action/Notification.  In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager.  Respondents shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order.  Within seven (7) days of the onset of such an event, Respondents shall furnish a report to DTSC, signed by Respondents' Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto.  If Respondents fail to take appropriate action and DTSC takes the action instead, each Respondent shall be liable to DTSC for all costs of the response action.  Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.20  Discontinuation of Remedial Technology.  Any remedial technology employed in implementation of the final RAP or final RAW shall be left in place and operated by Respondents until and except to the extent that DTSC authorizes Respondents in writing to discontinue, move, or modify some or all of the remedial technology because Respondents has met the criteria specified in the final RAP or final RAW for its discontinuance, or because the modifications would better achieve the goals of the final RAP or final RAW.

5.21 Financial Assurance.  Respondents shall demonstrate to DTSC and maintain financial assurance for operation and maintenance and monitoring.  Respondents shall demonstrate financial assurance prior to the time that operation and maintenance activities are initiated and shall maintain it throughout the period of time necessary to complete all required operation and maintenance activities.  The financial assurance mechanisms shall meet the requirements of Health and Safety Code Section 25355.2.  All financial assurance mechanisms are subject to the review and approval of DTSC.

Unilateral ISE Order
April 24, 2017

## VI. GENERAL PROVISIONS

6.1 <u>Project Coordinator</u>. Within four (4) days from the date the Order is signed by DTSC, Respondents shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from DTSC. Respondents shall promptly notify DTSC of any change in the identity of the Project Coordinator. Respondents shall obtain approval from DTSC before the new Project Coordinator performs any work under this Order.

6.1.1 <u>Communication and Coordination Plan (CCP)</u>. Within thirty (30) days from the date this Order is signed by DTSC, Respondents shall submit to DTSC for its approval a CCP which specifies the requirements and procedures by which Respondents will communicate and coordinate with one another in carrying out the requirements of this Order.

6.2 <u>Project Engineer/Geologist</u>. With the exception of the work required in Section 5.1.1 of this Order, the work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or geologist licensed in the State of California, with expertise in hazardous substance site cleanups. Within fifteen (15) days from the date this Order is signed by DTSC, Respondents must submit: a) The name and address of the project engineer or geologist chosen by Respondents; and b) in order to demonstrate expertise in hazardous substance cleanup, the resume of the engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work. Respondents shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist. Respondents shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3 <u>Monthly Summary Reports</u>. Within thirty (30) days from the date this Order is signed by DTSC, and on a monthly basis thereafter, Respondents shall submit a Monthly Summary Report of its activities under the provisions of this Order. The report shall be received by DTSC by the fifteenth (15th) day of each month and shall describe:

(a) Specific actions taken by or on behalf of Respondents during the previous calendar month;

(b) Actions expected to be undertaken during the current calendar month;

(c) All planned activities for the next month;

(d) Any requirements under this Order that were not completed;

(e) Any problems or anticipated problems in complying with this Order; and

Unilateral ISE Order
April 24, 2017

(f)  All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4  Quality Assurance/Quality Control (QA/QC).  All sampling and analysis conducted by Respondents under this Order shall be performed in accordance with QA/QC procedures submitted by Respondents and approved by DTSC pursuant to this Order.

6.5  Submittals.  All submittals and notifications from Respondents required by this Order shall be sent simultaneously to:

> Janet Naito
> Regional Branch Chief
> Brownfields and Environmental Restoration Program
> Department of Toxic Substances Control
> 700 Heinz Avenue
> Berkeley, California 94710

All reports shall be submitted in one hard (paper) copy and one electronic copy on a compact disc in searchable portable document format (PDF).

6.6  Communications.  All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondents in writing by the Site Mitigation Branch Chief, or his/her designee.  No informal advice, guidance, suggestions, or comments by DTSC regarding reports, plans, specifications, schedules, or any other writings by Respondents shall be construed to relieve Respondents of the obligation to obtain such formal approvals as may be required.

6.7  DTSC Review and Approval.

(a) All response actions taken pursuant to this Order shall be subject to the approval of DTSC.  Respondents shall submit all deliverables required by this Order to DTSC.  Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b)  If DTSC determines that any report, plan, schedule, or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

(1)  Modify the document as deemed necessary and approve the document as modified; or

Unilateral ISE Order
April 24, 2017

(2) Return comments to Respondents with recommended changes and a date by which Respondents must submit to DTSC a revised document incorporating the recommended changes.

(c) Any modifications, comments or other directives issued pursuant to (a) above, are incorporated into this Order. Any noncompliance with these modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8 Compliance with Applicable Laws. Nothing in this Order shall relieve Respondents from complying with all other applicable laws and regulations, including, but not limited to, compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board. Respondents shall conform all actions required by this Order with all applicable federal, state, and local laws and regulations.

6.9 Respondents' Liabilities. Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current, or future operations of Respondents. Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site. Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment and recovering the cost thereof. Notwithstanding compliance with the terms of this Order, Respondents may be required to take further actions as are necessary to protect public health and the environment.

6.10 Site Access. Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC. Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law. DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to: inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site; reviewing the progress of Respondents in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondents.

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondents, Respondents shall use best efforts to secure from such persons access for Respondents, as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order. To the extent that any portion of the Site is controlled by tenants of Respondents, Respondents shall use best efforts to secure from such tenants, access for Respondents, as well as for DTSC, its representatives, and contractors, as necessary to effectuate this Order. For purposes of this

Unilateral ISE Order
April 24, 2017

Section, "best efforts" includes the payment of reasonable sums of money in consideration of access. If any access required to complete the Work is not obtained within forty-five (45) days of the Effective Date of this Order, or within forty-five (45) days of the date DTSC notifies Respondents in writing that additional access beyond that previously secured is necessary, Respondents shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondents has taken to attempt to obtain access. DTSC may, as it deems appropriate, assist Respondents in obtaining access. Respondents shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

6.11  Site Access for Respondents. Respondents shall grant access to other Respondents who are in compliance with this Order for the purpose of conducting activities pursuant to this Order or for activities deemed necessary by DTSC to meet the objectives of this Order.

6.12  Sampling, Data and Document Availability. Respondents shall permit DTSC and its authorized representatives to inspect and copy all sampling, testing, monitoring or other data generated by Respondents or on Respondents' behalf in any way pertaining to work undertaken pursuant to this Order. Respondents shall submit all such data upon the request of DTSC. Copies shall be provided within seven (7) days of receipt of DTSC's written request. Respondents shall inform DTSC at least seven (7) days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondents pursuant to this Order. Respondents shall maintain a central depository of the data, reports, and other documents prepared pursuant to this Order.

6.13  Record Retention. All such data, reports and other documents shall be preserved by Respondents for a minimum of ten (10) years after the conclusion of all activities under this Order. If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondents shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction. Respondents shall notify DTSC in writing at least six (6) months prior to destroying any documents prepared pursuant to this Order.

6.14  Government Liabilities. The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondents, or related parties specified in Section 6.26, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondents or their agents in carrying out activities pursuant to this Order.

6.15  Additional Actions. By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.16  Extension Requests. If Respondents are unable to perform any activity or submit any document within the time required under this Order, Respondents may, prior to expiration of the time, request an extension of the time in writing. The extension request shall include a

Unilateral ISE Order
April 24, 2017

justification for the delay. All such requests shall be in advance of the date on which the activity or document is due.

6.17  Extension Approvals. If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing. Respondents shall comply with the new schedule incorporated in this Order.

6.18  Liability for Costs. Each Respondent is liable for all of DTSC's costs that have been incurred in taking response actions at the Site (including costs of overseeing response actions performed by Respondents) and costs to be incurred by DTSC in the future.

6.19  Payment of Costs. DTSC may bill Respondents for costs incurred in taking response actions at the Site prior to the Effective Date of this Order. DTSC will bill Respondents quarterly for its response costs incurred after the Effective Date of this Order. Respondents shall pay DTSC within sixty (60) days of receipt of any DTSC billing. Any billing not paid within sixty (60) days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1. All payments made by Respondents pursuant to this Order shall be by cashier's or certified check made payable to this "DTSC," and shall bear on the face the project code of the Site (Site TO BE DETERMINED) and the Docket number of this Order. Payments shall be sent to:

> Department of Toxic Substances Control
> Accounting/Cashier
> 1001 I Street, 21st Floor
> P.O. Box 806
> Sacramento, California 95812-0806

A scanned copy of all payment checks shall also be sent to the person designated by DTSC to receive submittals under this Order.

6.20  Severability. The requirements of this Order are severable, and Respondents shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

6.21  Incorporation of Plans, Schedules and Reports. All plans, schedules, reports, specifications and other documents that are submitted by Respondent pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondents. Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

6.22  Modifications. DTSC reserves the right to unilaterally modify this Order. Any

Unilateral ISE Order
April 24, 2017

modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

6.23  Time Periods.  Unless otherwise specified, time periods begin from the Effective Date of this Order and "days" means calendar days.

6.24  Termination and Satisfaction.  Except for Respondents' obligations under Sections 5.14, Operation and Maintenance (O&M); 5.15, Five-Year Review; 5.20, Financial Assurance; 6.13 Record Retention; 6.18 Liability for Costs; and 6.19 Payment of Costs, Respondents obligations under this Order shall terminate and be deemed satisfied upon Respondents receipt of written notice from DTSC that Respondents have complied with all the terms of this Order.

6.25  Calendar of Tasks and Schedules.  This Section is merely for the convenience of listing in one location the submittals required by this Order.  If there is a conflict between the date for a scheduled submittal within this Section and the date within the Section describing the specific requirement, the latter shall govern.

### Calendar of Tasks and Schedules

| TASK | SCHEDULE |
|---|---|
| 1.   Take Drainage Control Measures; Section 5.1.1(a)(i) | Immediately |
| 2. Identify Project Coordinator; Section 6.1 | Within four (4) days of the Effective Date of this Order |
| 3. Identify and provide credentials for qualified and independent third-party retained to perform the work required by Section 5.1.1.; Section 5.1.1(a) | Within four (4) days of the Effective Date of this Order |
| 4. Submit Workplan to DTSC providing for the removal of liquids from sumps and failing tanks; Section 5.1.1(a)(ii)(1) | Within ten (10) days of the Effective Date of this Order |
| 5. Identify Project Engineer/Geologist; Section 6.2 | Within fifteen (15) days of the Effective Date of this Order |
| 6. Complete removal specified in Workplan prepared in accordance with Section 5.1.1.(a)(ii)(1); Section 5.1.1.(a)(ii)(1) | Within twenty (20) days of the Effective Date of this Order |
| 7. Submit Monthly Summary Reports; Section 6.3 | Within thirty (30) days of the Effective Date of this Order |

Unilateral ISE Order
April 24, 2017

| | |
|---|---|
| 8. Submit to DTSC inventory and Workplan with Schedule; Section 5.1.1(a)(iii) | Within thirty-five (35) days of the Effective Date of this Order |
| 9. Submit RI/FS Workplan; Section 5.2.2 | Within thirty (30) days of the Effective Date of this Order |
| 10. Submit interim screening and evaluation document; Section 5.3 | As requested by DTSC |
| 11. Submit Treatability Studies; Section 5.45 | As required during Site characterization or as requested by DTSC |
| 12. Submit RI Report; Section 5.5 | Per approved RI/FS Workplan Schedule |
| 13. Submit Baseline Risk Assessment; Section 5.6 | Within thirty (30) days, or as required, from submittal of RI Report |
| 14. Submit FR Report; Section 5.7 | Within thirty (30) days from submittal of RI Report |
| 15. Submit Public Participation Plan; Section 5.8 | Within forty (40) days from the Effective Date of this Order |
| 16. Submit and distribute Fact Sheets | For projected or completed key milestones, as specified in approved Public Participation Plan, or when requested by DTSC |
| 17. Submit Initial Study and Checklist; Section 5.9 | Within thirty (30) days after approval of FS Report |
| 18. Submit Draft RAP or Draft RAW; Section 5.10 or 5.11 | Within thirty (30) days after approval of FS Report |
| 19. Submit information needed to prepare Responsiveness Summary | Within ten (10) days of DTSC request |
| 20. Submit Final RAP or RAW | Within fifteen (15) days of receipt of DTSC's comments |
| 21. Submit Remedial Design; Section 5.12 | Within fifteen (15) days of receipt of DTSC's comments |
| 22. Land Use Covenant; Section 5.13 | Within ninety (90) days of approval of Final RAP or Final RAW |
| 23. Submit Implementation Report; Section 5.14 | Within thirty (30) days of completion of filed activities |
| 24. Submit O&M Workplan; Section 5.15 | Within thirty (30) days of DTSC's requests |

Unilateral ISE Order
April 24, 2017

| 25. | Submit Remedial Action Review Workplan; Section 5.16 | Within thirty (30) days before end of five-year period |
|---|---|---|
| 26. | Submit Emergency Response Action Report; Section 5.19 | Within seven (7) days of an emergency response action |
| 27. | Provide copies of sampling, data, and documentation; Section 6.12 | Within seven (7) days of receipt of DTSC's request |
| 28. | Provide prior notice before conducting field sampling; | Inform DTSC seven (7) days in advance of sampling |
| 29. | Maintain central depository of data, reports, documentation; Sections 6.12 and 6.13 and | Minimum of ten (10) years after conclusion of all activities conducted pursuant to this Order |
| 30. | Provide written notice to DTSC before destroying any documentation prepared pursuant to this Order; Section 6.13 | At least six months prior to destroying any documents |

6.26  Parties Bound.  This Order applies to and is binding upon each Respondent, and each Respondent's respective officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including, but not limited to, individuals, partners, and subsidiary and parent corporations. Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants that are retained to conduct any work performed under this Order within fifteen (15) days after the Effective Date of this Order or the date of retaining their services, whichever is later.  Respondents shall condition any such contracts upon satisfactory compliance with this Order.  Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Order and for ensuring that their respective subsidiaries, employees, contractors, consultants, subcontractors, agents, and attorneys comply with this Order.

6.27  Change in Ownership.  No change in ownership or corporate or partnership status relating to the Site shall in any way alter each Respondent's responsibilities under this Order. No conveyance of title, easement, or other interest in the Site, or a portion of the Site, shall affect each Respondent's obligations under this Order.  Unless DTSC agrees that such obligations may be transferred to a third party, each Respondent shall be responsible for and liable for any failure to carry out all activities required of Respondents by the terms and conditions of this Order, regardless of any Respondent's use of employees, agents, contractors, or consultants to perform any such tasks.  Respondents shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred.

Unilateral ISE Order
April 24, 2017

## VII.  NOTICE OF INTENT TO COMPLY

7.  Not later than three (3) days after the Effective Date of this Order, each Respondent shall provide written notice, in accordance with Section 6.5, Submittals of this Order, stating whether or not Respondent will comply with the terms of this Order.  If Respondents, or any one of them, do not unequivocally commit to perform all of the requirements of this Order, they, or each so refusing, shall be deemed to have violated this Order and to have failed or refused to comply with this Order.  Respondents' written notice shall describe, using facts that exist on or prior to the Effective Date of this Order, any "sufficient cause" defenses asserted by Respondents under Health and Safety Code sections 25358.3(a) and 25355.5(a)(1)(B) or the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) section 107(c)(3), 42 U.S.C. section 9607(c)(3).

## VIII.  EFFECTIVE DATE

8.    This Order is final and effective on the date it is served on you (Effective Date).

## IX.  PENALTIES FOR NONCOMPLIANCE

9.  Pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c), each Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive damages up to three times the amount of any costs incurred by DTSC due to Respondents' failure to comply.  Health and Safety Code section 25359.4.5 provides that a responsible party who complies with this Order, or with another order or agreement concerning the same response actions required by this Order, may seek treble damages from any Respondent who fails or refuses to comply with this Order without sufficient cause.

DATE OF ISSUANCE: 4/24/2017

Janet Naito
Regional Branch Chief
Brownfields and Environmental
Restoration Program
Department of Toxic Substances Control

Unilateral ISE Order
April 24, 2017

33

# Exhibit A

For Assessment Use Only



ASSESSOR'S MAP I

OAKLAND (KELLERSBERGER'S)
R.M.9769

# Exhibit B

# E-D COAT
## MAP OF LOCATIONS SEARCHED



KEY:

LOCATION #1: 716 4th Street, Small Rack Line (Line A), Large Rack Line (Line B)

LOCATION #2: 407 Castro Street, Warehouse

LOCATION #3: 411 Castro Street, Shipping and Receiving

LOCATION #4: 715 & 721 4th Street, Old Barrel Line (Line D), Cleaning & Pickling Line (Line E)

LOCATION #5: 725 4th Street, New Automatic Line (Line C), Chem Film Line (Line G)

LOCATION #6: 714 & 718 3rd Street, Waste Treatment Yard

Exhibit C





## Department of Toxic Substances Control



**Matthew Rodriquez**
Secretary for
Environmental Protection

Barbara A. Lee, Director
700 Heinz Avenue
Berkeley, California 94710-2721

**Edmund G. Brown Jr.**
Governor

June 19, 2017

PERSONAL SERVICE OR CERTIFIED MAIL

Lisa Rossi
In her individual capacity and as doing business as E-D Coat, Inc.
715 4th Street
Oakland, California 94607-3017
LRossi32@aol.com

Gerald (Jerry) Rossi, in his individual capacity, as a
Trustee of Jerry & Patricia S. Rossi Trust, and as Trustee of Frank and
Mildred E. Rossi Trust
715 4th Street
Oakland, California 94607-3017

Patricia Rossi, as Trustee of Jerry & Patricia Rossi Trust
715 4th Street
Oakland, California 94607-3017

NOTICE OF DETERMINATION OF NON-COMPLIANCE WITH IMMINENT AND/OR
SUBSTANTIAL ENDANGERMENT DETERMINATION AND ORDER AND REMEDIAL
ACTION ORDER, E-D COAT, INC. OAKLAND, CALIFORNIA,
DOCKET NO. HSA FY 16/17-107

Dear Sir and Madams:

On June 5, 2017, the Department of Toxic Substances Control (DTSC) issued an
Imminent and/or Substantial Endangerment Determination and Order and Remedial
Action Order, Docket No. HSA FY 16/17-107 (Order) to Lisa Rossi, and individual and
doing business as E-D Coat, Inc.; Gerald (Jerry) Rossi, an individual and Trustee of
Jerry & Patricia S. Rossi Trust, and Trustee of Frank and Mildred E. Rossi Trust; and
Patricia Rossi, Trustee of Jerry & Patricia Rossi Trust (Respondents) as parties
responsible for the investigation and cleanup of a release of hazardous substances at
the E-D Coat Site located at 715, 716, 721, 725, 726, 732, and 734 4th Street; 714 and
718 3rd Street; 703, 707, 713, and 715 5th Street; 410, 414, and 418 Brush Street; and
407 and 411 Castro Street, Oakland, California (Site).

Ms. Lisa Rossi, Mr. Gerald Rossi and Ms. Patricia Rossi
June 19, 2017
Page 2

Section 5.1.1.a.iii of the Order requires that Respondents must submit to DTSC for review:

1. An inventory identifying the location, type, and quantity of all hazardous substances located in tanks, sumps, drums, or any other container at the Site. The inventory must identify the proposed final disposition of all material (inventory); and

2. A workplan which contains a schedule for removal of all hazardous substances from the Site (Removal Workplan).

Section 5.2.2 of the Order requires that the Respondents prepare and submit to DTSC for review and approval a detailed Remedial Investigation/Feasibility Study (RI/FS) Workplan and implementation schedule, which covers all activities necessary to conduct a complete RI/FS for the Site.

On June 5, 2017, DTSC issued a Notice of Proposed Determination of Non-Compliance to the Order to the Respondents because the inventory and Removal Workplan were not submitted by May 29, 2017, and the RI/FS Workplan was not submitted by May 31, 2017. The Respondents were given until June 12, 2017 by close of business to submit the inventory, Removal Workplan and RI/FS Workplan to DTSC. On the other hand, the Respondents could submit, within five calendar days, an explanation in writing requesting to modify the Order. The explanation should include the reasons for the modification as well as a thorough description of the actual modification and proposed Order amendment language.

On June 9, 2017, Lisa Rossi sent a request via electronic mail (email) to modify the Order. Specifically, Ms. Rossi requested that the Order be modified to extend the due dates for the RI/FS Workplan, and inventory. The basis for this request was described as follows:

1. Enviro Assets, the consultant who Respondent had previously identified as the Project Engineer pursuant to section 6.2 of the Order was unable to provide services and meet the Order deadlines, and therefore would not be preparing the RI/FS Workplan;

2. Ms. Rossi is discussing the possibility that NRC will prepare the RI/FS Workplan; therefore, additional time and funds will be needed to conduct this work. A timeline was not provided but Ms. Rossi stated that she, "should have a quote and timeline for the completion of the RI/FS by June 16, 2017."

3. Testing and analysis of all chemicals on site is needed in order to prepare the inventory of the hazardous substances required by the Order. Ms. Rossi indicated that she would not complete this testing and analysis until June 30, 2017.

In summary, Ms. Rossi's email indicates that Respondents are currently engaged in limited sampling and analysis of some of the hazardous substances remaining at the Site but neither commits to completing a full inventory of all hazardous substances remaining at the Site nor commits to a date by which this will be completed.

Ms. Lisa Rossi, Mr. Gerald Rossi and Ms. Patricia Rossi
June 19, 2017
Page 3

Furthermore, the email indicates that the project engineer (per Section 6.2 of the Order) is no longer involved with the project.  The name and qualifications of a new project engineer/geologist have not been provided. The correspondence also did not commit to the date by which the RI/FS would be submitted and also did not address submittal of the Removal Workplan required by Section **5.1.1.a.iii.** of the Order.

DTSC denies the request to modify the Order because, as discussed in the previous paragraph, Respondents have failed to submit the inventory, Removal Workplan and RI/FS Workplan.  Furthermore, the Site conditions pose an imminent and/or substantial endangerment to public health and the environment and as such, removal of the hazardous substances cannot be delayed further.

Therefore, DTSC makes the following determination:

DTSC HEREBY DETERMINES THAT YOU ARE NOT IN COMPLIANCE WITH THE TERMS OF THE IMMINENT AND/OR SUBSTANTIAL ENDANGERMENT DETERMINATION AND ORDER AND REMEDIAL ACTION ORDER, DOCKET NO. HSA 16/17-107.  Having so determined, DTSC will take certain removal actions required pursuant to this Order.  As a result of your failure to comply with this Order, DTSC will seek cost recovery for all costs incurred, including administrative costs, in connection with any remedial investigations and remedial actions taken by DTSC. DTSC may also assess penalties of up to $25,000 for each day out of compliance and for punitive damages up to three times the amount of any costs incurred by DTSC as a result of your failure to comply with the Order.

In addition, please find attached for your review and signature a Consent for Access to Property which will enable DTSC to enter the property to conduct an inventory to identify the location, type, and quantity of all hazardous substances located in tanks, sumps, drums, or any other container at the Site; collect samples and analyze the contents of tanks, sumps, and other containers; and remove and/or repackage liquids and solids from tanks, sumps and other containers for off-site disposal. Please review, sign and return the Consent for Access to Property to DTSC

If you have any questions regarding this letter or the Order, please contact DTSC project manager, Lynn Nakashima at (510) 540-3839, via email at Lynn.Nakashima@dtsc.ca.gov, or in writing at:

Lynn Nakashima
Senior Environmental Scientist
Brownfields and Environmental Restoration Program
Department of Toxic Substances Control
700 Heinz Avenue
Berkeley, CA  94710

Ms. Lisa Rossi, Mr. Gerald Rossi and Ms. Patricia Rossi
June 19, 2017
Page 4

If you are represented by counsel in this matter, your counsel may contact Ms. Sonia Wills at (510) 540-3916, via email at Sonia.Wills@dtsc.ca.gov, or in writing at:

Sonia Wills
Senior Attorney
Office of Legal Counsel
Department of Toxic Substances Control
700 Heinz Avenue
Berkeley, CA 94710

Sincerely,

Janet Naito, Regional Branch Chief
Berkeley Cleanup Operations Branch
Brownfields and Environmental Restoration Program

Enclosure

cc:     Sonia Wills, Sonia.Wills@dtsc.ca.gov

Certified Mail Nos:

- Lisa Rossi        7011 2970 0001 8295 4206
- Gerald Rossi       7011 2970 0001 8295 4176
- Patricia Rossi     7011 2970 0001 8295 4183

## CONSENT FOR ACCESS TO PROPERTY

Property Owners:

**E-D Coat, Inc.**
**715 4ᵗʰ Street**
**Oakland, California 94607**

**Gerald (Jerry) Rossi**
**An Individual and as Trustee of the Jerry & Patricia S. Rossi Trust and as Trustee of the Frank**
**and Mildred E. Rossi Trust**
**715 4ᵗʰ Street**
**Oakland, California 94607**

**Patricia Rossi**
**Trustee of the Jerry & Patricia S. Rossi Trust**
**715 4ᵗʰ Street**
**Oakland, California 94607**

Property Addresses:
**715, 716, 721, 725, 726, 732 and 734 4ᵗʰ Street, 714 and 718 3ʳᵈ Street, 703, 707, 713, 715 5ᵗʰ Street,**
**410, 414 and 418 Brush Street, and 407 and 411 Castro Street, Oakland, California 94607**

Assessor Parcel Numbers (APNs): **115-13-9, 1-115-15, 1-115-21, 1-115-22, 1-115-24, 1-115-23, 1-115-**
**26, 1-115-29, 1-115-34, 1-115-35, 1-115-36, 1-115-17-1, 1-115-18-1, 1-115-18-2, 1-115-28, and 001-**
**121-27-2**

I consent to officers, employees, contractors, and other authorized representatives of the Department of
Toxic Substances Control (DTSC) entering and having continued access to my property located at the
addresses/APNs indicated above for the following purposes:

1. Prepare an inventory to identify the location, type and quantity of all hazardous substances
   located in tanks, sumps, drums and any other container at the Site.
2. Collect and analyze the contents of tanks, sumps, and any other containers for the purposes of
   identifying the contents prior to removal.
3. Removal and/or repackaging of hazardous substances from tanks, sumps and other containers for
   off-site disposal.

The access provided herein will remain in effect until completion of tank, sump and other container
sampling and the off-site removal of hazardous substances. The duration of these activities is
anticipated to take approximately 45 days beginning on July 10, 2017. All activities will be performed
between the hours of 8 a.m. to 5 p.m.

I understand that the activities to be conducted by DTSC may involve the disturbance of soil, and I
therefore should advise DTSC agents of the location of known hazards on my property. DTSC will use
reasonable efforts to return the property to its prior condition. Upon request, DTSC will provide the
analytical sampling results.

Consent for Access to Property
E-D Coat, Inc.
715 4th Street
Oakland, CA  94607

This Access Agreement may be signed in counterparts, and each counterpart shall be deemed an original, but all of which shall constitute one and the same instrument.

This consent is given voluntarily and with knowledge of my right to refuse.  I certify that I am authorized to execute the Consent for Access on behalf of the property owners, and to legally bind said parties to the terms of this Consent for Access.

For E-D Coat, Inc.:

_____          By:   _____
DATE                                    SIGNATURE

                                        _____
                                        PRINT NAME

                                        _____
                                        TITLE

For Gerald (Jerry) Rossi:

Date: _____

                                        _____
                                        Jerry Rossi

For Jerry & Patricia S. Rossi Trust:

Date: _____          By:   _____
                                        SIGNATURE(S)

                                        _____
                                        PRINT NAME(S)

                                        _____
                                        TITLE(S)

Consent for Access to Property
E-D Coat, Inc.
715 4th Street
Oakland, CA  94607

For Frank and Mildred E. Rossi Trust:


Date: _____          By: _____
                                      SIGNATURE(S)


                                      _____
                                      PRINT NAME(S)


                                      _____
                                      TITLE(S)

Exhibit D

STATE OF CALIFORNIA
ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of ) | Docket No. <u>HAS FY 16/17-107</u> |
| ) | |
| E-D Coat Inc. ) | |
| 715 4th Street ) | FIRST AMENDMENT TO |
| ) | IMMINENT AND/OR SUBSTANTIAL |
| Oakland, California ) | ENDANGERMENT |
| ) | DETERMINATION AND ORDER |
| Respondents: ) | AND REMEDIAL ACTION ORDER |
| ) | |
| E-D Coat, Inc. ) | Health and Safety Code |
| ) | Sections 25355.5(a)(1)(B), 25355.5(b)(3) |
| Lisa Rossi, an individual ) | 25358.3, 58009 and 58010 |
| ) | |
| Jerry & Patricia S. Rossi Trust ) | |
| ) | |
| Gerald (Jerry) Rossi, an individual ) | |
| and in his capacity as Trustee of the ) | |
| Jerry & Patricia S. Rossi Trust, ) | |
| Frank and Mildred E. Rossi Trust, and ) | |
| Rossi Family Trust ) | |
| ) | |
| Patricia Rossi, in her capacity as ) | |
| Trustee of the Jerry & Patricia S. ) | |
| Rossi Trust and Rossi Family Trust ) | |
| ) | |
| Frank and Mildred E. Rossi Trust ) | |
| ) | |
| Rossi Family Trust ) | |
| ) | |
| 410 Brush Street, LLC ) | |
| ) | |
| J&M Real Estate Group, LLC ) | |
| ) | |
| Mireles Investments LLC ) | |
| ) | |
| 715 4th Street LLC ) | |
| ) | |
| Steppingstone Assets Group LLC ) | |

Samson Gebreselassie, an individual )

Yikaalo Gebreselassi, an individual )

John Sullivan, an individual )

Tan Tseng, an individual, as a joint )
tenant, and in his Capacity as Trustee )
of 3D Clone Inc. 401 K Plan and Trust )

Warren Huan Tseng, as a joint tenant )

3D Clone Inc. 401 K Plan & Trust )

_____)

The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) hereby amends the Imminent and Substantial Endangerment Determination and Order and Remedial Action Order (Docket No. HSA FY 16/17-107) (the "Order") issued by DTSC on April 24, 2017 (Attachment 1), to add the Rossi Family Trust, 401 Brush Street, LLC, J & M Real Estate Group, LLC, Mireles Investments LLC, 715 4th Street LLC, Steppingstone Assets Group LLC, Samson Gebreselassie, Yikaalo Gebreselassie, John Sullivan, Tan Tseng, Warren Huan Tseng, and 3D Clone Inc. 401 K Plan & Trust as additional "Respondents" within the meaning of section 1.1 of the Order. Section 1.1 was also modified to change the capacity in which Lisa Rossi is named as a Respondent. The defined term "Site" in section 1.2 was modified to add additional properties, delete Alameda County Assessor's Parcel Numbers (APNs), and modify the total approximate acreage. Section 2.1 of the Order was amended to indicate that E-D Coat is an active California corporation and Respondents' ownership and operator information was added and or modified. Section 2.2 was modified to add additional properties. Exhibit A was modified to include the Assessor's Map depicting the location of APN 1-121-27-2.

Sections 1.1, 1.2, 2.1, 2.2, and Exhibit A of the Order are hereby amended as follows:

    1.1    **Parties.** The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent and Substantial Endangerment Determination and Order and Remedial Action Order (Order) to E-D Coat, Inc., a California corporation; Lisa Rossi, an individual and as having done business as E-D Coat, Inc.; Gerald (Jerry) Rossi, an individual and Trustee of the Jerry & Patricia S.

Unilateral ISE Order
Amendment 1
April 5, 2019

Rossi Trust; Patricia Rossi, Trustee of the Jerry & Patricia S. Rossi Trust; the Frank and Mildred E. Rossi Trust; the Rossi Family Trust; 410 Brush Street, LLC, a California limited liability company; J & M Real Estate Group, LLC, a Georgia limited liability company; Mireles Investments LLC, a California limited liability company; 715 4th Street LLC, a California limited liability company; Steppingstone Assets Group LLC, a California limited liability company; Samson Gebreselassie, a joint tenant; Yikaalo Gebreselassie, a joint tenant; John Sullivan, an individual; Tan Tseng, an individual, a joint tenant, and as a Trustee of 3D Clone Inc. 401 K Plan and Trust; Warren Huan Tseng, a joint tenant; and 3D Clone Inc 401 K Plan & Trust (collectively, Respondents; individually, Respondent).

   1.2   Property/Site.  This Order applies to the property located at 715, 716, 721, 725, 726, 732 and 734 4th Street; 714 and 718 3rd Street; property identified as 3rd Street with no street number; 685, 703, 707, 713, and 715 5th Street; property identified as 5th Street with no street number; 410, 414, and 418 Brush Street; properties identified as Brush Street with no street number; and 407 and 411 Castro Street, Oakland, California 94607.  The property consists of approximately 1.6 acres and is identified by Alameda County Assessor's Parcel numbers (APNs) 1-115-5, 1-115-12, 1-115-13-2, 1-115-13-9, 1-115-17-1, 1-115-18-2, 1-115-21, 1-115-22, 1-115-23, 1-115-24, 1-115-26, 1-115-28, 1-115-29, 1-115-34, 1-115-35, 1-115-36 and 1-121-27-2.  Maps showing the property are attached as Exhibit A.  This Order applies to the property and the areal extent of contamination that resulted from activities on the property (hereinafter, the "Site").

   2.1   Liability of Respondents.  Each Respondent is a responsible party or liable person as defined in Health and Safety Code section 25323.5.  E-D Coat, Inc. (E-D Coat) owned a portion of the Site identified as APNs 1-115-12, 1-115-13-9, 1-115-26, and 1-115-27-2 that was used to operate a metal plating business since E-D Coat was first incorporated in approximately 1966 until at least May 2018 when the properties were sold by Alameda County at a tax defaulted land auction.  E-D Coat is an active California corporation but was a suspended California corporation by the California Secretary of State for failure to pay taxes between approximately February 2016 and September 13, 2018.

   Lisa Rossi is the current operator of all or a portion of the Site and operated the Site during the time when hazardous substances were disposed at the Site between February 2016 and September 13, 2018 when E-D Coat was a suspended corporation and Lisa Rossi did business as E-D Coat.  Lisa Rossi has been managing, directing, and conducting operations specifically related to hazardous waste management

activities.  Lisa Rossi has been directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Jerry & Patricia S. Rossi Trust previously owned from approximately 1999 to 2018 a portion of the Site identified as APNs 1-115-5, 115-13-2, 1-115-17-1, 1-115-18-2, 1-115-22, 1-115-23, 1-115-24, 1-115-29, 1-115-34, 1-115-35, 1-115-36.  Jerry Rossi and Patricia S. Rossi are trustees of the Jerry & Patricia S. Rossi Trust.

Jerry Rossi operated the plating business at the Site and operated the Site during the time when hazardous substances were disposed at the Site.  Jerry Rossi previously owned between approximately 1977 and 2018 a portion of the Site identified as APNs 1-115-12, 1-115-26, 1-115-28, and 1-121-27-2.  Jerry Rossi managed, directed, and conducted operations specifically related to hazardous waste management activities.  Jerry Rossi was directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Frank and Mildred E. Rossi Trust previously owned prior to 1999 portions of the Site identified as APNs 1-115-5, 1-115-13-2, 1-115-17-1, 1-115-18-2, 1-115-29, 1-115-34, 1-115-35, and 1-115-36.  Jerry Rossi is the Trustee of the Frank and Mildred E. Rossi Trust.

The Rossi Family Trust previously owned until at least May 2018 when the properties were sold by Alameda County at a tax defaulted land auction.  portions of the Site identified as APNs 1-115-5, 1-115-18-2, 1-115-21, 1-115-22, 1-115-23, 1-115-24, 1-115-29, 1-115-34, 1-115-35, and 1-115-36.

Samson Gebreselassie currently owns as of 2018, as a joint tenant with Yikaalo Gebreselassie a portion of the Site identified as APN 1-115-5.

Yikaalo Gebreselassie currently owns as of 2018, as a joint tenant with Samson Gebreselassie, a portion of the Site identified as APN 1-115-5.

John Sullivan currently owns as of 2018 a portion of the Site identified as APN 1-121-27-2.

Tan Tseng currently owns as of 2018 portions of the Site identified as APN 1-115-21.  Tan Tseng also currently owns, as a joint tenant with Warren Huan Tseng, portions of the Site identified as APNs 1-115-12, 1-115-13-9, and 1-115-17-1.

Warren Huan Tseng currently owns as of 2018, as a joint tenant with Tan Tseng, portions of the Site identified as APNs 1-115-12, 1-115-13-9, and 1-115-17-1.

410 Brush Street LLC currently owns as of 2018 portions of the Site identified as APN 1-115-23, 1-115-24, and 1-115-26.

J & M Real Estate Group, LLC currently owns as of 2018 a portion of the Site identified as APN 1-115-22.

Mireles Investments, LLC currently owns as of 2018 a portion of the Site identified as APN 1-115-13-2.

715 4th Street LLC currently owns as of 2018 a portion of the Site identified as APN 1-115-29.

Steppingstone Assets Group LLC currently owns as of 2018 portions of the Site identified as APN 1-115-28, 1-115-34, 1-115-35, and 1-115-36.

3D Clone Inc. 401 K Plan & Trust currently owns as of 2018 a portion of the Site identified as APN 1-115-18-2.

2.2     Physical Description of Site.   The Site is located at 715, 716, 721, 725, 726, 732, and 734 4th Street; 685, 703, 707, 713, and 715 5th Street; property identified as 5th Street that does not have a street number; 407 and 411 Castro Street; 714 and 718 3rd Street; property identified as 3rd Street that does not have a street number; 410, 414, and 418 Brush Street; and properties identified as Brush Street that do not have street numbers in the City of Oakland, California.  The Site is generally bounded by 5th Street to the north, Castro Street to the east, 3rd Street to the south, and Brush Street to the west.  Fourth Street divides the Site.  A church and residential properties, including at least three single family homes and a multi-family apartment building, border the Site. The Site is currently being used as a U-Haul rental business.  A Site Location Map is attached as Exhibit A.

DATE OF ISSUANCE: 4/5/2019

Daniel Murphy
Site Mitigation and Restoration Program
Department of Toxic Substances Control

Unilateral ISE Order
Amendment 1
April 5, 2019

5

Exhibit A

For Assessment Use Only



For Assessment Use Only



Google Earth

Appendix A

E-D Cost Site Location

STATE OF CALIFORNIA
CALIFORNIA ENVIRONMENTAL PROTECTION AGENCY
DEPARTMENT OF TOXIC SUBSTANCES CONTROL

| | |
|---|---|
| In the Matter of: ) | Docket No. HSA_FY 16/17-107 |
| ) | |
| **E-D Coat, Inc.** ) | |
| 715 4th Street ) | IMMINENT AND/OR SUBSTANTIAL |
| Oakland, California ) | ENDANGERMENT |
| ) | DETERMINATION AND ORDER |
| Respondents: ) | AND REMEDIAL ACTION ORDER |
| ) | |
| E-D Coat, Inc. ) | Health and Safety Code |
| ) | Sections 25355.5(a)(1)(B), 25355.5(b)(3) |
| Lisa Rossi, an individual ) | 25358.3, 58009 and 58010 |
| ) | |
| Jerry & Patricia S. Rossi Trust ) | |
| ) | |
| Gerald (Jerry) Rossi, an individual ) | |
| and in his capacity as Trustee of the ) | |
| Jerry & Patricia S. Rossi Trust and ) | |
| Frank and Mildred E. Rossi Trust ) | |
| ) | |
| Patricia Rossi, in her capacity as ) | |
| Trustee of the ) | |
| Jerry & Patricia S. Rossi Trust ) | |
| ) | |
| Frank and Mildred E. Rossi Trust ) | |

## I. INTRODUCTION

1.1 Parties. The California Environmental Protection Agency, Department of Toxic Substances Control (DTSC) issues this Imminent and/or Substantial Endangerment Determination and Order and Remedial Action Order (Order) to E-D Coat, Inc., a California Corporation; Lisa Rossi, an individual and doing business as E-D Coat, Inc.; Gerald (Jerry) Rossi, an individual and Trustee of the Jerry & Patricia S. Rossi Trust; Patricia Rossi, Trustee of the Jerry & Patricia S. Rossi Trust; and the Frank and Mildred E. Rossi Trust (collectively, Respondents; individually, Respondent).

Unilateral ISE Order
April 24, 2017

1

.1.2  Property/Site.  This Order applies to the property located at 715, 716, 721, 725, 726, 732 and 734 4th Street, 714 and 718 3rd Street, 703, 707, 713, 715 5th Street, 410, 414 and 418 Brush Street, and 407 and 411 Castro Street, Oakland, California 94550.  The property consists of approximately one acre and is identified by Alameda County Assessor's Parcel number(s) (APNs) 1-115-5, 1-115-12, 1-115-13-2, 1-115-13-9, 1-115-15, 1-115-21, 1-115-22, 1-115-24, 1-115-23, 1-115-26, 1-115-29, 1-115-34, 1-115-35, 1-115-36, 1-115-17-1, 1-115-18-1, 1-115-18-2, and 1-115-28, 001-121-27-2.  A map showing the property is attached as Exhibit A.  This Order applies to the property and the areal extent of contamination that resulted from activities on the property (hereinafter, the "Site").

1.3  Jurisdiction.  This Order is issued by DTSC to Respondents pursuant to its authority under Health and Safety Code sections 25358.3, 25355.5(a)(1)(B), 25355.5(b)(3), 58009 and 58010. Respondents are subject to the provisions of Chapters 6.5 and 6.8 of Division 20 of the Health and Safety Code because there has been a release of a hazardous substance on, under, or into the land of the subject site.  Because Respondents engaged in the generation and management of hazardous waste, Respondents are subject to the Hazardous Waste Control Law, Chapter 6.5 of Division 20 of the Health and Safety Code, and its implementing regulations.

Health and Safety Code section 25358.3 authorizes DTSC to take various actions, including issuance of an Imminent or Substantial Endangerment Determination and Order, when DTSC determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or a threatened release of a hazardous substance.

Health and Safety Code section 25355.5(a)(1)(B) authorizes DTSC to issue an order establishing a schedule for removing or remedying a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance.  The order may include, but is not limited to, requiring specific dates by which the nature and extent of a release shall be determined and the site adequately characterized, preparation and submittal of a remedial action plan to DTSC for approval, and completion of a removal or remedial action.

Health and Safety Code section 25355.5(b)(3) authorizes DTSC to expend funds from the Hazardous Substance Account and the Hazardous Substance Cleanup Fund without first taking the actions specified in Health and Safety Code section 25355.5(a), if DTSC determines that removal or remedial action is necessary at a site because there may be an imminent and substantial endangerment to the public health or welfare or to the environment, because of a release or threatened release of a hazardous substance.

Health and Safety Code section 58009 authorizes DTSC to commence and maintain all proper and necessary actions and proceedings to enforce its rules and regulations; to enjoin and abate nuisances related to matters within its jurisdiction which are dangerous to health; to compel the performance of any act specifically enjoined upon any person, officer, or board, by any law

Unilateral ISE Order
April 24, 2017

of this state relating to matters within its jurisdiction; and/or on matters within its jurisdiction, to protect and preserve the public health.

Health and Safety Code section 58010 authorizes DTSC to abate public nuisances related to matters within its jurisdiction.

## II. FINDINGS OF FACT

DTSC hereby finds:

2.1  Liability of Respondents. Each Respondent is a responsible party or liable person as defined in Health and Safety Code section 25323.5. E-D Coat, Inc. (E-D Coat) is a suspended California corporation that owns a portion of the Site identified as APNs 1-115-12, 1-115-26, and 1-115-27-2. E-D Coat operated a metal plating business at the Site until its corporate status was suspended in February 2016 by the California Secretary of State for failure to pay taxes. E-D Coat has operated at the Site since the business was first incorporated in approximately 1966.

Lisa Rossi is the current operator of the Site and operated the Site during the time when hazardous substances were disposed at the Site. Lisa Rossi is currently doing business as E-D Coat, Inc. Lisa Rossi has been managing, directing, and conducting operations specifically related to hazardous waste management activities. Lisa Rossi has been directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Jerry & Patricia S. Rossi Trust currently owns portions of the Site identified as APNs 1-115-13-2, 1-115-29, 1-115-34, 1-115-35, 1-115-36, 1-115-17-1, and 1-115-18-2. Jerry & Patricia S. Rossi Trust have owned portions of the Site since at least 1999. Jerry Rossi and Patricia S. Rossi are Trustees of the Jerry & Patricia S. Rossi Trust. Prior to 1999, these portions of the Site were owned by the Frank and Mildred E. Rossi Trust.

Jerry Rossi operated the plating business at the Site and operated the Site during the time when hazardous substances were disposed at the Site. Jerry Rossi is the current owner of a portion of the Site known as APNs 1-115-28, 1-121-27-2 and has owned the property since approximately 1977. Jerry Rossi managed, directed, and conducted operations specifically related to hazardous waste management activities. Jerry Rossi was directly and actively involved in the hazardous waste management decisions and overall operations at the Site.

The Frank and Mildred E. Rossi Trust owns portions of the Site identified as APNs 1-115-18-1, 1-115-5 and 1-115-15. Jerry Rossi is the Trustee of the Frank and Mildred E. Rossi Trust.

2.2  Physical Description of Site. The Site is located at 715, 716, 721, 725, 726, 732, and 734 4th Street; 703, 707, 713, 715 5th Street, 407 and 411 Castro Street; 714 and 718 3rd Street;

Unilateral ISE Order
April 24, 2017

and 410, 414 and 418 Brush Street in the City of Oakland, California. The Site is generally bounded by 5th Street to the north, Castro Street to the east, 3rd Street to the South, and Brush Street to the west. Fourth Street divides the Site. A church and residential properties, including at least three single family homes and a multi-family apartment building, border the Site. The Site is currently being used as a U-Haul rental business. A Site Location Map is attached as Exhibit A.

2.3  Site History and Condition.  E-D Coat was incorporated in September 1966. E-D Coat operated as an electroplating facility providing zinc, cadmium, and chromium plating services until approximately 2012. E-D Coat's hazardous materials inventory submitted with local regulators identified the following hazardous materials stored at the Site: sodium hydroxide, nitric acid, hydrochloric acid, hydrofluoric acid, sulfuric acid, zinc, cadmium, and others.

On or about 1993, E-D Coat, Inc. applied for a permit-by-rule (PBR) under the tiered permitting program in accordance with California Code of Regulations, title 22, section 67450.11 in order to treat hazardous waste generated by onsite plating operations. E-D Coat operated its two PBR units, a heater and filter press. One PBR unit treated wastewater in order to reduce hexavalent chromium to trivalent chromium. The other PBR unit treated cyanide-bearing hazardous waste (zinc cyanide and cadmium cyanide).

A United States Environmental Protection Agency (USEPA) Region IX Site Screening Checklist for the Site conducted by DTSC in June 1997 identified a potential for a release of hazardous substances, pollutants, or contaminants because of an unpaved floor surface, lack of secondary containment, and possible leaking of drums or tanks.

In November 1999, USEPA executed a search warrant for suspected unlawful discharge of wastewater to the sewer system, which resulted in criminal convictions against Jerry Rossi and fines.

In April 2009, the Alameda County District Attorney's Office executed a search warrant based on an a East Bay Municipal Utility District (EBMUD) allegation that metal discharges to the sewer were occurring near the E-D Coat facility, which resulted in EBMUD issuing a complaint and fine.

In June 2011, EBMUD terminated E-D Coat's wastewater discharge permit because of illegal discharges to the sewer. In March 2012, the Alameda County District Attorney's Office executed a search warrant based on EBMUD allegations of metal discharges to the sewer. Due to various EBMUD violations, including discharge violations, E-D Coat was ordered to cease all operations. E-D Coat ceased its plating operations on or about 2012.

In July 2015, USEPA and the Alameda County Department of Environmental Health (ACDEH) conducted inspections during 2015 and 2016, noting violations in 2016 related to the corroded condition of tanks and drums at the E-D Coat facility. In March and April 2017, ACDEH issued Notices of Violations related to the 2016 inspections.

On April 19, 2017, the Alameda County District Attorney's Office executed a search warrant at the following six distinct areas of the Site:

1. Location #1: 716 4th Street, Small Rack Line (Line A), Large Rack Line (Line B);
2. Location #2: 407 Castro Street, Warehouse;
3. Location #3: 411 Castro Street, Shipping and Receiving;
4. Location #4: 715 & 721 4th Street, Old Barrel Line (Line D), Cleaning & Pickling Line (Line E);
5. Location #5: 725 4th Street, New Automatic Line (Line C), Chem Film Line (Line G); and
6. Location #6: 714 & 718 3rd Street, Waste Treatment Yard.

These areas searched are depicted in Exhibit B. Representatives of DTSC, ACDEH, USEPA, and other state and local agencies assisted with the search warrant operations.

Location #4 includes the Old Barrel Line (Line D) and the Cleaning and Pickling Line (Line E), which contains chemical storage areas (made up of drums and other small containers) and multiple plating lines. The line identified as the Old Barrel Line is comprised of approximately sixteen tanks that are heavily corroded and the concrete below the tanks is badly etched and degraded indicating previous releases of plating liquids. Over time, acidic liquids corrode concrete and alkaline liquids leave crystal residues. The Old Barrel Line contains solids and other residues. Another line adjacent to the Old Barrel Line is the Zinc Plating Line. The Zinc Plating Line is comprised of approximately 16 tanks that were heavily corroded and concrete below the tanks are stained and corroded indicating previous releases of plating liquids. The tanks contain varying amounts of liquid solutions and are estimated to contain thousands of gallons of caustic (alkaline) cleaners and zinc (acidic) solutions in total. The roof directly above one of the tanks on the Zinc Plating Line, labeled as "Tank E12, Hydrochloric acid," had collapsed. Tarps covering the hole in the roof are distended, holding approximately 75 gallons of rainwater. Further rain could cause the tarp to overflow into "Tank E12, Hydrochloric Acid," which, in turn, would cause the tank to overflow. Released hydrochloric acid would likely reduce the integrity of surrounding tanks and impact the integrity of the floor. "Tank E 13, Caustic Cleaner," the tank immediately adjacent to "Tank E12, Hydrochloric Acid," contained chemicals incompatible with one another and mixing of the contents could generate extreme heat and potentially release toxic gases.

Unilateral ISE Order
April 24, 2017

Also in Location #4 is the Cleaning and Pickling Line (Line E), which is comprised of approximately seven tanks that contained acidic or caustic (alkaline) solutions. "Tank E33, hydrochloric acid" contains approximately 1,000 gallons of hydrochloric acid solution. Approximately eight feet along the side of Tank E33 is completely corroded through so that there is a large hole in the side of the tank allowing the tank's inner liner to bulge out against the jagged edges of the hole in the tank. The tank liner appears to be aged and worn, and is therefore quite brittle. This tank is at significant risk of immediate failure. If the tank were to fail, the solution would likely corrode the tanks nearby, potentially causing additional releases of various acidic and/or alkaline plating wastes. The nearby tanks that could be impacted contain incompatible solutions, including caustic (alkaline) material. Because there is no secondary containment, the contents would likely flood the entire plating line.

Also in Location #4 is a tank labeled as "E31, Hydrochloric Acid." This tank is old and constructed of wooden boards. The interior liner is collapsing and dry residues along the top edge of the tank indicates the contents do not match the label and instead contain chromic acid. If the liner continued to collapse, the acid solution would immediately seep through the wood, causing damage to the surrounding tanks. The release would accelerate evaporation of the solution, which would cause hexavalent chromium to release to the air. Additionally, a steel I-beam located adjacent to this tank is corroded through at its footing, indicative of past releases of acidic plating liquids, and does not appear to be structurally sound.

Location #6 (Waste Treatment Yard) is a large, open outdoor yard facing 3rd street where approximately 15 hazardous waste treatment tanks are located. There are four underground sumps located in the yard that were part of hazardous waste PBR treatment operations and approximately 30 drums labeled as containing hazardous waste that are covered only with plastic wrap instead of lids. All four sumps are full of liquid, with only a minimal amount of freeboard to allow for further capacity. Further rain might cause the sumps to overflow, releasing the contents to the yard and offsite. Liquid was observed being actively pumped by an electric sump pump from the sumps and released via sprinklers to the concrete floor of the treatment yard. There are at least three locations where soil is exposed and likely impacted by the liquid released from the sprinklers.

Also in Location #6 is a tank that is approximately eleven feet tall and six feet in diameter labeled on the Site Map as "F1, Chrome Reduction." The tank is labeled "Sulfuric Acid – Trace, Chromium Acid – Trace, Nitric Acid - Trace." This tank is badly rusted and the support ladder allowing access to the top of the tank is no longer usable because sections of the ladder are missing due to corrosion. Approximately one-third of the way up the tank, there are pinholes in the side of the tank, allowing the contents to slowly run down the side of the tank to the ground.

Unilateral ISE Order
April 24, 2017

In Location #5, there are two plating lines (New Automatic Line (Line C), Chem Film Line (Line G), which contain a total of approximately 38 tanks. Most tanks have a capacity of approximately 3000 gallons and the majority of the tanks are at least half full and many are completely full. Caustic corrosion residuals on many of the tanks and multi-colored crystals on the floor below the tanks indicate that chemicals have been released. Additionally, various walls and other surfaces, including control panels and an eyewash station adjacent to the tanks, are coated with alkaline crystals.

In Location #1, there are two plating lines identified as Small Rack Line (Line A) and Large Rack Line (Line B). The plating lines include approximately 30 tanks. Some of the tanks contain small amounts of liquids and the majority of the tanks contain solids, sludge and crystals. Also, there is a large amount of crystallization that has built up on the exterior of the tanks and the floor below the tanks. Approximately 25 to 30 feet from Line B, there are two refrigerators. One of the refrigerators contains food. The concrete floor between the two plating lines is extremely corroded which indicates extensive historic releases of plating liquids. One wall that borders the adjacent residential property (724 4th Street) has extensive corrosion and numerous holes, some of which have completely gone through to the other side and have been patched.

Location #2, identified as the Warehouse, appear to be used for storage of U-Haul trucks, other vehicles, large volumes of holiday decorations, and other equipment formerly used in plating operations.

Location #3, identified as Shipping and Receiving, is being used for storage of personal effects, as well as storage of approximately six drums containing unknown chemicals.

2.4  Hazardous Substances Found at the Site.  The following hazardous substances have been found at the Site: Acids (hydrochloric acid, hydrofluoric acid, sulfuric acid, chromic acid, and nitric acid), caustic soda, cyanide, and heavy metals such as chromium, cadmium and zinc.

2.5  Health Effects.

2.5.1  Chromium.  Chromium compounds in the trivalent state are of a low order of toxicity. In the hexavalent state, chromium compounds are irritants and corrosive, and can enter the body by ingestion, inhalation, and through the skin. Acute exposures to chromium dust or mist may cause coughing and wheezing, headache, dyspnea, pain in deep inhalation, fever, and loss of weight. USEPA has determined that hexavalent chromium in air is a human carcinogen.

2.5.2  Cadmium.  Acute and chronic exposure to cadmium in animals and humans results in renal dysfunction, hypertension, anemia, and altered liver microsomal activity.

Unilateral ISE Order
April 24, 2017

According to USEPA, the kidney is considered to be the critical target organ in humans chronically exposed to cadmium by ingestion. USEPA has determined that cadmium in air is a human carcinogen.

2.5.3 Cyanide. Cyanide is readily absorbed through the skin, mucous membrane, and by inhalation. Symptoms of cyanide poisoning include anxiety, confusion, vertigo, nausea, convulsions, paralysis, coma, cardiac arrhythmias, and transient respiratory stimulation followed by respiratory failure.

2.5.4 Chromic Acid. Symptoms of chromic acid exposure include irritation to the respiratory system; nasal septum perforation; liver and kidney damage; leukocytosis (increased blood leukocytes), leukopenia (reduced blood leukocytes), eosinophilia; eye injury; conjunctivitis; and skin ulcer, sensitization dermatitis. Chromic acid is a potential occupational carcinogen (lung cancer).

2.5.5 Hydrochloric Acid. Hydrochloric acid is a highly corrosive material. The presence of acids is indicated by a low pH (less than 7). Hydrochloric acid is highly toxic by ingestion and inhalation. It is a strong irritant to the eyes, skin and mucous membrane. More severe exposures result in pulmonary edema and laryngeal spasm. Concentrations of 1,000-2,000 parts per million (ppm) are dangerous, even for brief exposure.

2.5.6 Hydrofluoric Acid. The dissolved form of hydrogen fluoride is called hydrofluoric acid. Acute inhalation of hydrofluoric acid can cause bronchiolar ulceration, pulmonary hemorrhage and edema, and death. Renal and hepatic damage have been observed in animal studies. The major health effect of chronic inhalation exposure is skeletal fluorosis.

2.5.7 Nitric Acid. Nitric acid exposure may cause irritation or burns to the eyes, skin and mucous membrane; delayed pulmonary edema; pneumonitis, bronchitis; and dental erosion.

2.5.8 Sulfuric Acid. Dermal contact with sulfuric acid will burn skin, and inhalation can result in tooth erosion and respiratory tract irritation. Ingestion of sulfuric acid can cause burns to the mouth, throat, and stomach. Severe exposure can result in death. The International Agency for Research on Cancer (IARC) has determined that occupational exposure to strong inorganic acid mists containing sulfuric acid is carcinogenic to humans. IARC has not classified pure sulfuric acid for its carcinogenic effects.

2.5.9 Caustic Soda. Caustic soda is a strongly alkaline material. The presence of alkaline material is indicated by an elevated pH (greater than 7). Caustic soda is corrosive and has an irritating effect on all body tissue, causing burns and deep ulcerations. Inhalation can cause damage to the upper respiratory tissue and lung tissue, with effects ranging from mucous membrane irritation to severe pneumonitis.

Unilateral ISE Order
April 24, 2017

2.5.10 <u>Zinc</u>. Ingesting high levels of zinc for several months may cause anemia, damage the pancreas, and decrease levels of high-density lipoprotein (HDL) cholesterol. EPA has determined that because of lack of information, zinc is not classifiable as to its human carcinogenity.

2.6 <u>Routes of Exposure</u>. Routes of exposure include direct contact, ingestion, dermal absorption, and inhalation by humans and animals. Due to the deteriorated condition of the pavement covering the Site and because the floor in the plating area was historically unpaved, hazardous substances at the Site may have migrated to soil and contaminated groundwater. The most likely sources of exposure are inhalation or direct contact with airborne contamination that may be dispersed directly from the Site or dispersed by wind or rain from contaminated soil or other surfaces. Groundwater migration is possible; groundwater is located within 10 feet of the ground surface. Unremediated soil currently located under the pavement may have affected groundwater or may remain a source of release to groundwater. Surface water runs to a storm water system in the street that discharges to the Oakland Inner Harbor Channel which is located approximately 2,000 feet away. The Oakland Inner Harbor Channel connects to the San Francisco Bay.

2.7 <u>Public Health and/or Environmental Risk</u>. The Site is currently being used as a U-Haul rental business and there are workers onsite, as well as members of the public that rent U-Hauls from the Site. The area around the Site is mixed residential and industrial. There is a single-family residence and a multi-family apartment building located adjacent to the Site. There are also many residences located across the street from the facility. There is a church located at the corner of Brush St. and 4th St. There are various commercial buildings located near the Site.

## III. CONCLUSIONS OF LAW

3.1    Each Respondent is a responsible party as defined by Health and Safety Code section 25323.5.

3.2    Each of the substances listed in Section 2.4 is a "hazardous substance" as defined in Health and Safety Code section 25316.

3.3    There has been a "release" and/or there is a "threatened release" of hazardous substances listed in Section 2.4 at the Site as defined in Health and Safety Code section 25320.

3.4    The actual and threatened release of hazardous substances at the Site presents an imminent and substantial endangerment to the public health or welfare or to the environment.

3.5    Response action is necessary to protect public health and the environment and to abate a public nuisance.

Unilateral ISE Order
April 24, 2017

## IV.  DETERMINATION

4.1     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that response action is necessary at the Site because there has been a release and/or there is a threatened release of hazardous substances.

4.2     Based on the foregoing findings of fact and conclusions of law, DTSC hereby determines that there may be an imminent and/or substantial endangerment to the public health or welfare or to the environment because of the release and/or the threatened release of the hazardous substances at the Site.

## V.  ORDER

Based on the foregoing FINDINGS, CONCLUSIONS, AND DETERMINATION, IT IS HEREBY ORDERED THAT Respondents conduct the following response actions in the manner specified herein, and in accordance with a schedule specified by DTSC as follows:

5.1     All response actions taken pursuant to this Order shall be consistent with the requirements of Chapter 6.8 (commencing with section 25300), Division 20 of the Health and Safety Code and any other applicable state or federal statutes and regulations.

5.1.1   Removal Actions.  Respondents shall undertake removal actions if, during the course of the remedial investigation (RI) or feasibility study (FS), DTSC determines that response actions are necessary to mitigate the release and/or threatened release of hazardous substances at or emanating from the Site.  DTSC may require Respondents to submit a removal action workplan that includes a schedule for implementing the workplan for DTSC's approval. Either DTSC or Respondents may identify the need for removal actions.  Respondents shall also implement the following removal actions:

a.  Respondents shall, under DTSC's oversight, initiate and cause to be performed by a qualified and independent third party, the following activities:

i.   Drainage Control. Immediately upon the Effective Date of this Order take all necessary drainage control measures to ensure that run-off and run-on are appropriately diverted to reduce migration of hazardous substances off-site and to prevent precipitation of run-off from other sources such as flooding.  This includes, but is not limited to, the following:
1.     All measures necessary to prevent the release of rainwater accumulated in the tarp covering the hole in the roof to Tank E12, Hydrochloric Acid. (Location #4 of Exhibit B).
2.     All measures necessary to prevent the overflow of all outdoor sumps, open-topped tanks, drums, and containers. (Location #6 of Exhibit

Unilateral ISE Order
April 24, 2017

B).

    ii.    <u>Removal of Liquids from Sumps and Failing Tanks.</u>

        1.    Within ten (10) days of the Effective Date of this Order, Respondents shall submit a Workplan to DTSC that characterizes and provides for the removal of all liquids, debris and other materials from all sumps and tanks at the Site posing an immediate risk of failure or overflow including, but not limited to, the following:

            I.    "Tank E12, Hydrochloric acid" (Location #4 of Exhibit B).

           II.    "Tank E13, Caustic Cleaner" (Location #4 of Exhibit B).

          III.    "Tank E33, Hydrochloric acid" (Location #4 of Exhibit B).

          IV.    "Tank E31, Hydrochloric acid" (Location #4 of Exhibit B).

           V.    Tank labeled "Sulfuric Acid – Trace, Chromium Acid – Trace, Nitric Acid – Trace" (Location #6 of Exhibit B).

          VI.    Four underground sumps (Location #6 of Exhibit B).

        2.    Removal of all liquids, debris and other materials from all sumps and tanks at the Site posing an immediate risk of failure or overflow, including the units identified in Section 5.1.1.a.ii.1, above, must be completed to the satisfaction of DTSC within twenty (20) days of the Effective Date of this Order.

    iii.    <u>Submission of Hazardous Waste and Hazardous Material Inventory and Workplan with Schedule for Removal</u>

        1.    Within 35 days of the Effective Date of this Order, Respondents shall submit to DTSC for review:

           I.    An inventory identifying the location, type, and quantity of all hazardous substances located in tanks, sumps, drums, or any other container at the Site. The inventory must identify the proposed final disposition of all material.

           II.    A workplan which contains a schedule for removal of all hazardous substances from the Site.

b. DTSC must be provided with sufficient advance written notice of all activities taken in accordance with subsection (a) of this section to allow DTSC to observe and monitor such activities. This includes, but is not limited to: any site walks or inventories with prospective or currently retained consultants or contractors; draining, pumping, repairing or repackaging of any tanks, drums or other containers; and offsite removal of any hazardous substances.

c. Respondents shall conduct all actions required by Section 5.1.1 in compliance with Chapter 6.5 and Chapter 6.8 of Division 20 of the Health and Safety Code and the applicable regulations in Division 4.5 of Title 22 of the California Code of Regulations.

Unilateral ISE Order
April 24, 2017

d. In the event that Respondents fail to take the actions provided in Section 5.1.1, and DTSC takes the action instead, Respondents shall be subject to penalties and damages specified in Section 9 and shall be liable to DTSC for all costs of the response action as specified in Section 6.18. Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.2  Remedial Investigation/Feasibility Study (RI/FS). An RI/FS shall be conducted for the Site. The RI/FS may be performed as a series of focused RI/FSs, if appropriate, based on Site priorities. The RI/FS shall be prepared consistent with USEPA's "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA," October 1988. The purpose of the RI/FS is to assess Site conditions and to evaluate alternatives to the extent necessary to select a remedy appropriate for the Site. RI and FS activities shall be conducted concurrently and iteratively so that the investigations can be completed expeditiously. Because of the unknown nature of the Site and iterative nature of the RI/FS, additional data requirements and analyses may be identified throughout the process. Respondents shall fulfill additional data and analysis needs identified by DTSC; these additional data and analysis requests will be consistent with the general scope and objectives of this Order.

The following elements of the RI/FS process shall be preliminarily defined in the initial Site scoping and refined and modified as additional information is gathered throughout the RI/FS process.

(a)  Conceptual Site Model identifying contamination sources, exposure pathways, and receptors;

(b)  Federal, State and local remedial action objectives including applicable legal requirements or relevant and appropriate standards;

(c)  Project phasing including the identification of removal actions and operable units;

(d)  General response actions and associated remedial technology types; and

(e)  The need for treatability studies.

5.2.1  RI/FS Objectives. The objectives of the RI/FS are to:

(a)  Determine the nature and full extent of hazardous substance contamination of air, soil, surface water, and groundwater at the Site;

(b)  Identify all actual and potential exposure pathways and routes through environmental media;

Unilateral ISE Order
April 24, 2017

(c)  Determine the magnitude and probability of actual or potential harm to public health, safety or welfare or to the environment posed by the threatened or actual release of hazardous substances at or from the Site;

(d)  Identify and evaluate appropriate response actions to prevent or minimize future releases and mitigate any releases which have already occurred; and

(e)  Collect and evaluate the information necessary to prepare a remedial action plan (RAP).

5.2.2. RI/FS Workplan.  Within 30 days from the Effective Date of this Order, Respondents shall prepare and submit to DTSC for review and approval a detailed RI/FS Workplan and implementation schedule which covers all the activities necessary to conduct a complete RI/FS of the Site.

The RI/FS Workplan shall include a detailed description of the tasks to be performed, information or data needed for each task, and the deliverables that will be submitted to DTSC. Either Respondents or DTSC may identify the need for additional work.

These RI/FS Workplan deliverables are discussed in the remainder of this Section, with a schedule for implementation, and monthly reports.  The RI/FS Workplan shall include all the sections and address each component listed below.

(a)  Project Management Plan.  The Project Management Plan shall define relationships and responsibilities for major tasks and project management items by Respondents, its contractors, subcontractors, and consultants.  The plan shall include an organization chart with the names and titles of key personnel and a description of their individual responsibilities.

(b)  Scoping Document.  The Scoping Document shall incorporate program goals, program management principles, and expectations contained in the National Contingency Plan (NCP) (40 Code of Federal Regulations (CFR) Part 300), as amended.  It shall include:

(1) An analysis and summary of the Site background and the physical setting.  At a minimum, the following information is required:

(A) A map of the Site, and if they exist, aerial photographs and blueprints showing buildings and structures;

(B) A description of past disposal practices;

Unilateral ISE Order
April 24, 2017

(C) A list of all hazardous substances which were disposed, discharged, spilled, treated, stored, transferred, transported, handled or used at the Site, and a description of their estimated volumes, concentrations, and characteristics;

(D) A description of the characteristics of the hazardous substances at the Site; and

(E) If applicable, a description of all current and past manufacturing processes which are or were related to each hazardous substance.

(2) An analysis and summary of previous response actions including a summary of all existing data including air, soil, soil gas, surface water, and groundwater data and the Quality Assurance/Quality Control (QA/QC) procedures which were followed;

(3) Presentation of the Conceptual Site Model;

(4) The scope and objectives of RI/FS activities;

(5) Preliminary identification of possible response actions and the data needed for the evaluation of alternatives. Removal actions shall be proposed, if needed, based on the initial evaluation of threats to public health and the environment. If remedial actions involving treatment can be identified, treatability studies shall be conducted during the characterization phase, unless Respondents and DTSC agree that such studies are unnecessary as set forth in Section 5.4; and

(6) If applicable, initial presentation of the Site Remediation Strategy.

(c) Field Sampling Plan. The Field Sampling Plan shall include:

(1) Sampling objectives, including a brief description of data gaps and how the field sampling plan will address these gaps;

(2) Sample locations, including a map showing these locations, and proposed frequency;

(3) Sample designation or numbering system;

(4) Detailed specification of sampling equipment and procedures;

(5) Sample handling and analysis including preservation methods, shipping requirements and holding times; and

(6) Management plan for wastes generated.

Unilateral ISE Order
April 24, 2017

(d) Quality Assurance Project Plan.  The plan shall include:

(1)  Project organization and responsibilities with respect to sampling and analysis;

(2).  Quality assurance objectives for measurement including accuracy, precision, and method detection limits.  In selecting analytical methods, Respondents shall consider obtaining detection limits at or below potentially applicable legal requirements or relevant and appropriate standards, such as Maximum Contaminant Levels (MCLs) or Maximum Contaminant Level Goals (MCLGs);

(3)  Sampling procedures;

(4)  Sample custody procedures and documentation;

(5)  Field and laboratory calibration procedures;

(6)  Analytical procedures;

(7)  Laboratory to be used certified pursuant to Health and Safety Code section 25198;

(8)  Specific routine procedures used to assess data (precision, accuracy, and completeness) and response actions;

(9)  Reporting procedure for measurement of system performance and data quality;

(10) Data management, data reduction, validation, and reporting.  Information shall be accessible to downloading into DTSC's system; and

(11) Internal quality control.

(e) Health and Safety Plan.  A site-specific Health and Safety Plan shall be prepared in accordance with federal (29 CFR 1910.120) and state (Title 8 CCR Section 5192) regulations.  This plan should include, at a minimum, the following elements:

(1)  Site Background/History/Workplan;
(2)  Key Personnel and Responsibilities;
(3)  Job Hazard Analysis/Summary;
(4)  Employee Training;
(5)  Personal Protection;
(6)  Medical Surveillance;
(7)  Air Surveillance;

Unilateral ISE Order
April 24, 2017

15

(8)  Site Control;
(9)  Decontamination;
(10) Contingency Planning;
(11) Confined Space Operations;
(12) Spill Containment;
(13) Sanitation;
(14) Illumination; and
(15) Other applicable requirements based on the work to be performed.

All contractors and all subcontractors shall be given a copy of the Health and Safety Plan prior to entering the Site. Any supplemental health and safety plans prepared by any subcontractor shall also be prepared in accordance with the regulations and guidance identified above. The prime contractor will be responsible for ensuring that all subcontractor supplemental health and safety plans will follow these regulations and guidelines.

(f) Other Activities. A description of any other significant activities which are appropriate to complete the RI/FS shall be included.

(g) Schedule. A schedule which provides specific time frames and dates for completion of each activity and report conducted or submitted under the RI/FS Workplan including the schedules for removal actions and operable unit activities.

5.2.3  RI/FS Workplan Implementation. Respondents shall implement the approved RI/FS Workplan.

5.2.4  RI/FS Workplan Revisions. If Respondents propose to modify any methods or initiate new activities for which no Field Sampling Plan, Health and Safety Plan, Quality Assurance Project Plan, or other necessary procedures/plans have been established, Respondents shall prepare an addendum to the approved plan(s) for DTSC review and approval prior to modifying the method or initiating new activities.

5.3  Interim Screening and Evaluation of Remedial Technologies. At the request of DTSC, Respondents shall submit an interim document which identifies and evaluates potentially suitable remedial technologies and recommendations for treatability studies.

5.4  Treatability Studies. Treatability testing will be performed by Respondents to develop data for the detailed remedial alternatives. Treatability testing is required to demonstrate the implementability and effectiveness of technologies, unless Respondents can show DTSC that similar data or documentation or information exists. The required deliverables are: a workplan, a sampling and analysis plan, and a treatability evaluation report. To the extent practicable, treatability studies will be proposed and implemented during the latter part of Site

Unilateral ISE Order
April 24, 2017

characterization.

5.5 <u>Remedial Investigation (RI) Report</u>. The RI Report shall be prepared and submitted by Respondents to DTSC for review and approval in accordance with the approved RI/FS workplan schedule. The purpose of the RI is to collect data necessary to adequately characterize the Site for the purposes of defining risks to public health and the environment and developing and evaluating effective remedial alternatives. Site characterization may be conducted in one or more phases to focus sampling efforts and increase the efficiency of the investigation. Respondents shall identify the sources of contamination and define the nature, extent, and volume of the contamination. Using this information, the contaminant fate and transport shall be evaluated. The RI Report shall contain:

(a) <u>Site Physical Characteristics</u>. Data on the physical characteristics of the Site and surrounding area shall be collected to the extent necessary to define potential transport pathways and receptor populations and to provide sufficient engineering data for development and screening of remedial action alternatives.

(b) <u>Sources of Contamination</u>. Contamination sources (including heavily contaminated media) shall be defined. The data shall include the source locations, type of contaminant, waste characteristics, and Site features related to contaminant migration and human exposure.

(c) <u>Nature and Extent of Contamination</u>. Contaminants shall be identified and the horizontal and vertical extent of contamination shall be defined in soil, groundwater, surface water, sediment, air, and biota. Spatial and temporal trends and the fate and transport of contamination shall be evaluated.

5.6 <u>Baseline Health and Ecological Risk Assessment</u>. Respondents shall perform health and ecological risk assessments for the Site that meet the requirements of Health and Safety Code section 25356.1.5(b). Respondents shall submit a Baseline Health and Ecological Risk Assessment Report within thirty (30) days from the approval of the RI Report. The report shall be prepared consistent with U.S. EPA and California Environmental Protection Agency guidance and regulations, including as a minimum: Risk Assessment Guidance for Superfund, Volume 1; Human Health Evaluation Manual, December 1989, and as amended; Superfund Exposure Assessment Manual, April 1988, and as amended; Risk Assessment Guidance for Superfund, Volume 2, Environmental Evaluation Manual, March 1989, and as amended; Supplemental Guidance for Human Health Multimedia Risk Assessments of Hazardous Waste Sites and Permitted Facilities (DTSC, September 1993), and as amended; and all other related or relevant policies, practices and guidelines of the California Environmental Protection Agency and policies, practices and guidelines developed by U.S.EPA pursuant to 40 CFR 300.400 et seq. The Baseline Health and Ecological Risk Assessment Report shall include the following components:

Unilateral ISB Order
April 24, 2017

(a) Contaminant Identification.  Characterization data shall identify contaminants of concern for the risk assessment process.

(b) Environmental Evaluation.  An ecological assessment consisting of:

(1)  Identification of sensitive environments and rare, threatened, or endangered species and their habitats; and

(2)  As appropriate, ecological investigations to assess the actual or potential effects on the environment and/or develop remediation criteria.

(c) Exposure Assessment.  The objectives of an exposure assessment are to identify actual or potential exposure pathways, to characterize the potentially exposed populations, and to determine the extent of the exposure.  Exposed populations may include industrial workers, residents, and subgroups that comprise a meaningful portion of the general population, including, but not limited to, infants, children, pregnant women, the elderly, individuals with a history of serious illness, or other subpopulations, that are identifiable as being at greater risk of adverse health effects due to exposure to hazardous substances than the general population.

(d) Toxicity Assessment.  Respondents shall evaluate the types of adverse health or environmental effects associated with individual and multiple chemical exposures; the relationship between magnitude of exposures and adverse effects; and related uncertainties such as the weight of evidence for a chemical's potential carcinogenicity in humans.

(e) Risk Characterization.  Risk characterization shall include the potential risks of adverse health or environmental effects for each of the exposure scenarios derived in the exposure assessment.

5.7  Feasibility Study (FS) Report.  The FS Report shall be prepared and submitted by Respondents to DTSC for review and approval, no later than thirty (30) days from submittal of the RI Report.  The FS Report shall summarize the results of the FS including the following:

(a)  Documentation of all treatability studies conducted.

(b)  Development of medium specific or operable unit specific remedial action objectives, including legal requirements and other promulgated standards that are relevant.

(c)  Identification and screening of general response actions, remedial technologies, and process options on a medium and/or operable unit specific basis.

Unilateral ISE Order
April 24, 2017

(d)  Evaluation of alternatives based on the criteria contained in the NCP, including:

Threshold Criteria:

(1)  Overall protection of human health and the environment.

(2)  Compliance with legal requirements and other promulgated standards that are relevant.

Primary Balancing Criteria:

(1)  Long-term effectiveness and permanence.

(2)  Reduction of toxicity, mobility, or volume through treatment.

(3)  Short-term effectiveness.

(4)  Implementability based on technical and administrative feasibility.

(5)  Cost.

Modifying Criteria:

(1)  State and local agency acceptance.

(2)  Community acceptance.

(e)  Proposed remedial actions.

5.8  Public Participation Plan (Community Relations).  Respondents shall work cooperatively with DTSC in providing an opportunity for meaningful public participation in response actions.  Any such public participation activities shall be conducted in accordance with Health and Safety Code sections 25356.1 and 25358.7 and DTSC's most current Public Participation Policy and Guidance Manual, and shall be subject to DTSC's review and approval.

Respondents, in coordination with DTSC, shall conduct a baseline community survey and develop a Public Participation Plan (PPP) which describes how, under this Order, the public and adjoining community will be kept informed of activities conducted at the Site and how Respondents will be responding to inquiries from concerned citizens.  Major steps in developing a PPP are as follows:

Unilateral ISE Order
April 24, 2017

(a) Develop proposed list of interviewees;

(b) Schedule and conduct community interviews; and

(c) Analyze interview notes, and develop objectives.

Respondents shall conduct the baseline community survey and submit the PPP for DTSC's review within forty (40) days of the Effective Date of this Order.

Respondents shall implement any of the public participation support activities identified in the PPP, at the request of DTSC. DTSC retains the right to implement any of these activities independently. These activities include, but are not limited to, development and distribution of fact sheets; public meeting preparations; and development and placement of public notices.

5.9   California Environmental Quality Act (CEQA). DTSC will comply with CEQA for all activities required by this Order that are projects subject to CEQA. Upon DTSC's request, Respondents shall provide DTSC with any information that DTSC deems necessary to facilitate compliance with CEQA. The costs incurred by DTSC in complying with CEQA are response costs and Respondents shall reimburse DTSC for such costs pursuant to Section 6.19.

5.10   Removal Action Workplan (RAW). If DTSC determines a removal action is appropriate, Respondents will prepare and submit no later than thirty (30) days after DTSC's approval of the FS, a draft Removal Action Workplan (RAW) in accordance with Health and Safety Code sections 25323.1 and 25356.1. The Removal Action Workplan will include:

(a)   a description of the onsite contamination;

(b)   the goals to be achieved by the removal action;

(c)   an analysis of the alternative options considered and rejected and the basis for that rejection. This should include a discussion for each alternative which covers its effectiveness, implementability and cost;

(d)   administrative record list;

(e)   a description of the techniques and methods to be used in the removal action, including any excavating, storing, handling, transporting, treating, and disposing of material on or off the site;

(f)   Sampling and Analysis Plan with corresponding Quality Assurance Plan to confirm the effectiveness of the RAW, if applicable;

(g)   a brief overall description of methods that will be employed during the removal action to ensure the health and safety of workers and the public during the removal action. A detailed community air monitoring plan shall be included if requested by DTSC.

Unilateral ISE Order
April 24, 2017

In conjunction with DTSC, Respondents shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual. DTSC will prepare a response to the public comments received. If required, the Respondents shall submit within two (2) weeks of the request the information necessary for DTSC to prepare this document.

Following DTSC's finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAW. Respondents shall modify the document in accordance with DTSC's specifications and submit a final RAW within fifteen (15) days of receipt of DTSC's comments.

If the proposed removal action does not meet the requirements of Health and Safety Code section 25356.1(h), the Respondents will prepare a Remedial Action Plan (RAP) in accordance with Health and Safety Code section 25356.1(c) for DTSC review and approval.

5.11  Remedial Action Plan (RAP).  No later than thirty (30) days after DTSC approval of the FS Report, Respondents shall prepare and submit to DTSC a draft RAP. The draft RAP shall be consistent with the NCP and Health and Safety Code section 25356.1. The draft RAP public review process may be combined with that of any other documents required by CEQA. The draft RAP shall be based on and summarize the approved RI/FS Reports, and shall clearly set forth:

(a)  Health and safety risks posed by the conditions at the Site.

(b)  The effect of contamination or pollution levels upon present, future, and probable beneficial uses of contaminated, polluted, or threatened resources.

(c)  The effect of alternative remedial action measures on the reasonable availability of groundwater resources for present, future, and probable beneficial uses.

(d)  Site specific characteristics, including the potential for offsite migration of hazardous substances, the surface or subsurface soil, and the hydrogeologic conditions, as well as preexisting background contamination levels.

(e)  Cost-effectiveness of alternative remedial action measures. Land disposal shall not be deemed the most cost-effective measure merely on the basis of lower short-term cost.

(f)  The potential environmental impacts of alternative remedial action measures, including, but not limited to, land disposal of the untreated hazardous substances as opposed to treatment of the hazardous substances to remove or reduce their volume, toxicity, or mobility prior to disposal.

Unilateral ISE Order
April 24, 2017

(g) A statement of reasons setting forth the basis for the removal and remedial actions selected. The statement shall include an evaluation of each proposed alternative submitted and evaluate the consistency of the removal and remedial actions proposed by the plan with the NCP.

(h) A schedule for implementation of all proposed removal and remedial actions.

In conjunction with DTSC, Respondent) shall implement the public review process specified in DTSC's Public Participation Policy and Guidance Manual. DTSC will prepare a response to the public comments received. If required, the Respondents shall submit, within two (2) weeks of the request, the information necessary for DTSC to prepare this document

Following DTSC's finalization of the Responsiveness Summary, DTSC will specify any changes to be made in the RAP. Respondent) shall modify the document in accordance with DTSC's specifications and submit a final RAP within fifteen (15) days of receipt of DTSC's comments.

5.12 Remedial Design (RD). Within sixty (60) days after DTSC approval of the final RAP, Respondents shall submit to DTSC for review and approval a RD describing in detail the technical and operational plans for implementation of the final RAP which includes the following elements, as applicable:

(a) Design criteria, process unit and pipe sizing calculations, process diagrams, and final plans and specifications for facilities to be constructed.

(b) Description of equipment used to excavate, handle, and transport contaminated material.

(c) A field sampling and laboratory analysis plan addressing sampling during implementation and to confirm achievement of the performance objectives of the RAP.

(d) A transportation plan identifying routes of travel and final destination of wastes generated and disposed.

(e) For groundwater extraction systems: aquifer test results, capture zone calculations, specifications for extraction and performance monitoring wells, and a plan to demonstrate that capture is achieved.

(f) An updated health and safety plan addressing the implementation activities.

(g) Identification of any necessary permits and agreements.

Unilateral ISE Order
April 24, 2017

(h)  An operation and maintenance plan including any required monitoring.

(i)  A detailed schedule for implementation of the remedial action consistent with the schedule contained in the approved RAP including procurement, mobilization, construction phasing, sampling, facility startup, and testing.

(j)  A community Air Monitoring Plan.

5.13  Land Use Covenant.  If the approved remedy in the final RAP or final RAW includes deed restrictions or land use restrictions, pursuant to California Code of Regulations, title 22, section 67391.1, the current owner(s) of the Site shall sign and record deed restrictions approved by DTSC within ninety (90) days of DTSC's approval of the final RAP.

5.14  Implementation of Final RAP or Final RAW.  Upon DTSC's approval of the RD or final RAW, Respondents shall implement the final RAP or final RAW in accordance with the approved schedule in the RD or final rap.  Within thirty (30) days of completion of field activities, Respondents shall submit an Implementation Report documenting the implementation of the Final RAP and RD or final RAW.

5.15  Operation and Maintenance (O&M).  Respondents shall comply with all O&M requirements in accordance with the final RAP and approved RD or final RAW.  Within thirty (30) days of the date of DTSC's request, Respondents shall prepare and submit to DTSC for approval an O&M plan that includes an implementation schedule.  Respondents shall implement the plan in accordance with the approved schedule.

5.16  Five-Year Review.  Respondent shall review and reevaluate the remedial action after a period of five (5) years from the completion of construction and startup, and every five (5) years thereafter.  The review and reevaluation shall be conducted to determine if human health and the environment are being protected by the remedial action.  Within thirty (30) days before the end of the time period approved by DTSC to review and reevaluate the remedial action, Respondents shall submit a remedial action review workplan to DTSC for review and approval. Within sixty (60) days of DTSC's approval of the workplan, Respondents shall implement the workplan and shall submit a comprehensive report of the results of the remedial action review. The report shall describe the results of all sample analyses, tests and other data generated or received by Respondents and evaluate the adequacy of the implemented remedy in protecting public health, safety, and the environment.  As a result of any review performed under this Section, Respondents may be required to perform additional Work or to modify Work previously performed.

5.17  Changes During Implementation of the Final RAP or Final RAW.  During the implementation of the final RAP and RD or final RAW, DTSC may specify such additions,

Unilateral ISE Order
April 24, 2017

23

modifications, and revisions to the RD or final RAW as DTSC deems necessary to protect public health and safety or the environment or to implement the final RAP or final RAW.

5.18 <u>Stop Work Order</u>. In the event that DTSC determines that any activity (whether or not pursued in compliance with this Order) may pose an imminent or substantial endangerment to the health or safety of people on the Site or in the surrounding area or to the environment, DTSC may order Respondents to stop further implementation of this Order for such period of time needed to abate the endangerment. In the event that DTSC determines that any site activities (whether or not pursued in compliance with this Order) are proceeding without DTSC authorization, DTSC may order Respondents to stop further implementation of this Order or activity for such period of time needed to obtain DTSC authorization, if such authorization is appropriate. Any deadline in this Order directly affected by a Stop Work Order, under this Section, shall be extended for the term of the Stop Work Order.

5.19 <u>Emergency Response Action/Notification</u>. In the event of any action or occurrence (such as a fire, earthquake, explosion, or human exposure to hazardous substances caused by the release or threatened release of a hazardous substance) during the course of this Order, Respondents shall immediately take all appropriate action to prevent, abate, or minimize such emergency, release, or immediate threat of release and shall immediately notify the Project Manager. Respondents shall take such action in consultation with the Project Manager and in accordance with all applicable provisions of this Order. Within seven (7) days of the onset of such an event, Respondents shall furnish a report to DTSC, signed by Respondents' Project Coordinator, setting forth the events which occurred and the measures taken in the response thereto. If Respondents fail to take appropriate action and DTSC takes the action instead, each Respondent shall be liable to DTSC for all costs of the response action. Nothing in this Section shall be deemed to limit any other notification requirement to which Respondents may be subject.

5.20 <u>Discontinuation of Remedial Technology</u>. Any remedial technology employed in implementation of the final RAP or final RAW shall be left in place and operated by Respondents until and except to the extent that DTSC authorizes Respondents in writing to discontinue, move, or modify some or all of the remedial technology because Respondents has met the criteria specified in the final RAP or final RAW for its discontinuance, or because the modifications would better achieve the goals of the final RAP or final RAW.

5.21 <u>Financial Assurance</u>. Respondents shall demonstrate to DTSC and maintain financial assurance for operation and maintenance and monitoring. Respondents shall demonstrate financial assurance prior to the time that operation and maintenance activities are initiated and shall maintain it throughout the period of time necessary to complete all required operation and maintenance activities. The financial assurance mechanisms shall meet the requirements of Health and Safety Code Section 25355.2. All financial assurance mechanisms are subject to the review and approval of DTSC.

Unilateral ISE Order
April 24, 2017

## VI.  GENERAL PROVISIONS

6.1  Project Coordinator.  Within four (4) days from the date the Order is signed by DTSC, Respondents shall submit to DTSC in writing the name, address, and telephone number of a Project Coordinator whose responsibilities will be to receive all notices, comments, approvals, and other communications from DTSC.  Respondents shall promptly notify DTSC of any change in the identity of the Project Coordinator.  Respondents shall obtain approval from DTSC before the new Project Coordinator performs any work under this Order.

6.1.1  Communication and Coordination Plan (CCP).  Within thirty (30) days from the date this Order is signed by DTSC, Respondents shall submit to DTSC for its approval a CCP which specifies the requirements and procedures by which Respondents will communicate and coordinate with one another in carrying out the requirements of this Order.

6.2  Project Engineer/Geologist.  With the exception of the work required in Section 5.1.1 of this Order, the work performed pursuant to this Order shall be under the direction and supervision of a qualified professional engineer or geologist licensed in the State of California, with expertise in hazardous substance site cleanups.  Within fifteen (15) days from the date this Order is signed by DTSC, Respondents must submit:  a) The name and address of the project engineer or geologist chosen by Respondents; and b) in order to demonstrate expertise in hazardous substance cleanup, the resume of the engineer or geologist, and the statement of qualifications of the consulting firm responsible for the work.  Respondents shall promptly notify DTSC of any change in the identity of the Project Engineer/Geologist.  Respondents shall obtain approval from DTSC before the new Project Engineer/Geologist performs any work under this Order.

6.3  Monthly Summary Reports.  Within thirty (30) days from the date this Order is signed by DTSC, and on a monthly basis thereafter, Respondents shall submit a Monthly Summary Report of its activities under the provisions of this Order.  The report shall be received by DTSC by the fifteenth (15th) day of each month and shall describe:

(a)  Specific actions taken by or on behalf of Respondents during the previous calendar month;

(b)  Actions expected to be undertaken during the current calendar month;

(c)  All planned activities for the next month;

(d)  Any requirements under this Order that were not completed;

(e)  Any problems or anticipated problems in complying with this Order; and

Unilateral ISE Order
April 24, 2017

(f) All results of sample analyses, tests, and other data generated under this Order during the previous calendar month, and any significant findings from these data.

6.4 Quality Assurance/Quality Control (QA/QC). All sampling and analysis conducted by Respondents under this Order shall be performed in accordance with QA/QC procedures submitted by Respondents and approved by DTSC pursuant to this Order.

6.5 Submittals. All submittals and notifications from Respondents required by this Order shall be sent simultaneously to:

> Janet Naito
> Regional Branch Chief
> Brownfields and Environmental Restoration Program
> Department of Toxic Substances Control
> 700 Heinz Avenue
> Berkeley, California 94710

All reports shall be submitted in one hard (paper) copy and one electronic copy on a compact disc in searchable portable document format (PDF).

6.6 Communications. All approvals and decisions of DTSC made regarding submittals and notifications will be communicated to Respondents in writing by the Site Mitigation Branch Chief, or his/her designee. No informal advice, guidance, suggestions, or comments by DTSC regarding reports, plans, specifications, schedules, or any other writings by Respondents shall be construed to relieve Respondents of the obligation to obtain such formal approvals as may be required.

6.7 DTSC Review and Approval.

(a) All response actions taken pursuant to this Order shall be subject to the approval of DTSC. Respondents shall submit all deliverables required by this Order to DTSC. Once the deliverables are approved by DTSC, they shall be deemed incorporated into, and where applicable, enforceable under this Order.

(b) If DTSC determines that any report, plan, schedule, or other document submitted for approval pursuant to this Order fails to comply with this Order or fails to protect public health or safety or the environment, DTSC may:

(1) Modify the document as deemed necessary and approve the document as modified; or

Unilateral ISE Order
April 24, 2017

(2) Return comments to Respondents with recommended changes and a date by which Respondents must submit to DTSC a revised document incorporating the recommended changes.

(c) Any modifications, comments or other directives issued pursuant to (a) above, are incorporated into this Order. Any noncompliance with these modifications or directives shall be deemed a failure or refusal to comply with this Order.

6.8  Compliance with Applicable Laws. Nothing in this Order shall relieve Respondents from complying with all other applicable laws and regulations, including, but not limited to, compliance with all applicable waste discharge requirements issued by the State Water Resources Control Board or a California Regional Water Quality Control Board. Respondents shall conform all actions required by this Order with all applicable federal, state, and local laws and regulations.

6.9  Respondents' Liabilities. Nothing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising as a result of past, current, or future operations of Respondents. Nothing in this Order is intended or shall be construed to limit the rights of any of the parties with respect to claims arising out of or relating to the deposit or disposal at any other location of substances removed from the Site. Nothing in this Order is intended or shall be construed to limit or preclude DTSC from taking any action authorized by law to protect public health or safety or the environment and recovering the cost thereof. Notwithstanding compliance with the terms of this Order, Respondents may be required to take further actions as are necessary to protect public health and the environment.

6.10  Site Access. Access to the Site and laboratories used for analyses of samples under this Order shall be provided at all reasonable times to employees, contractors, and consultants of DTSC. Nothing in this Section is intended or shall be construed to limit in any way the right of entry or inspection that DTSC or any other agency may otherwise have by operation of any law. DTSC and its authorized representatives shall have the authority to enter and move freely about all property at the Site at all reasonable times for purposes including, but not limited to: inspecting records, operating logs, sampling and analytic data, and contracts relating to this Site; reviewing the progress of Respondents in carrying out the terms of this Order; conducting such tests as DTSC may deem necessary; and verifying the data submitted to DTSC by Respondents.

To the extent the Site or any other property to which access is required for the implementation of this Order is owned or controlled by persons other than Respondents, Respondents shall use best efforts to secure from such persons access for Respondents, as well as DTSC, its representatives, and contractors, as necessary to effectuate this Order. To the extent that any portion of the Site is controlled by tenants of Respondents, Respondents shall use best efforts to secure from such tenants, access for Respondents, as well as for DTSC, its representatives, and contractors, as necessary to effectuate this Order. For purposes of this

Unilateral ISE Order
April 24, 2017

Section, "best efforts" includes the payment of reasonable sums of money in consideration of access. If any access required to complete the Work is not obtained within forty-five (45) days of the Effective Date of this Order, or within forty-five (45) days of the date DTSC notifies Respondents in writing that additional access beyond that previously secured is necessary, Respondents shall promptly notify DTSC, and shall include in that notification a summary of the steps Respondents has taken to attempt to obtain access. DTSC may, as it deems appropriate, assist Respondents in obtaining access. Respondents shall reimburse DTSC in obtaining access, including, but not limited to, attorneys fees and the amount of just compensation.

6.11 Site Access for Respondents. Respondents shall grant access to other Respondents who are in compliance with this Order for the purpose of conducting activities pursuant to this Order or for activities deemed necessary by DTSC to meet the objectives of this Order.

6.12 Sampling, Data and Document Availability. Respondents shall permit DTSC and its authorized representatives to inspect and copy all sampling, testing, monitoring or other data generated by Respondents or on Respondents' behalf in any way pertaining to work undertaken pursuant to this Order. Respondents shall submit all such data upon the request of DTSC. Copies shall be provided within seven (7) days of receipt of DTSC's written request. Respondents shall inform DTSC at least seven (7) days in advance of all field sampling under this Order, and shall allow DTSC and its authorized representatives to take duplicates of any samples collected by Respondents pursuant to this Order. Respondents shall maintain a central depository of the data, reports, and other documents prepared pursuant to this Order.

6.13 Record Retention. All such data, reports and other documents shall be preserved by Respondents for a minimum of ten (10) years after the conclusion of all activities under this Order. If DTSC requests that some or all of these documents be preserved for a longer period of time, Respondents shall either comply with that request or deliver the documents to DTSC, or permit DTSC to copy the documents prior to destruction. Respondents shall notify DTSC in writing at least six (6) months prior to destroying any documents prepared pursuant to this Order.

6.14 Government Liabilities. The State of California shall not be liable for any injuries or damages to persons or property resulting from acts or omissions by Respondents, or related parties specified in Section 6.26, Parties Bound, in carrying out activities pursuant to this Order, nor shall the State of California be held as party to any contract entered into by Respondents or their agents in carrying out activities pursuant to this Order.

6.15 Additional Actions. By issuance of this Order, DTSC does not waive the right to take any further actions authorized by law.

6.16 Extension Requests. If Respondents are unable to perform any activity or submit any document within the time required under this Order, Respondents may, prior to expiration of the time, request an extension of the time in writing. The extension request shall include a

Unilateral ISE Order
April 24, 2017

justification for the delay. All such requests shall be in advance of the date on which the activity or document is due.

6.17 Extension Approvals. If DTSC determines that good cause exists for an extension, it will grant the request and specify a new schedule in writing. Respondents shall comply with the new schedule incorporated in this Order.

6.18 Liability for Costs. Each Respondent is liable for all of DTSC's costs that have been incurred in taking response actions at the Site (including costs of overseeing response actions performed by Respondents) and costs to be incurred by DTSC in the future.

6.19 Payment of Costs. DTSC may bill Respondents for costs incurred in taking response actions at the Site prior to the Effective Date of this Order. DTSC will bill Respondents quarterly for its response costs incurred after the Effective Date of this Order. Respondents shall pay DTSC within sixty (60) days of receipt of any DTSC billing. Any billing not paid within sixty (60) days is subject to interest calculated from the date of the billing pursuant to Health and Safety Code section 25360.1. All payments made by Respondents pursuant to this Order shall be by cashier's or certified check made payable to this "DTSC," and shall bear on the face the project code of the Site (Site TO BE DETERMINED) and the Docket number of this Order. Payments shall be sent to:

Department of Toxic Substances Control
Accounting/Cashier
1001 I Street, 21st Floor
P.O. Box 806
Sacramento, California 95812-0806

A scanned copy of all payment checks shall also be sent to the person designated by DTSC to receive submittals under this Order.

6.20 Severability. The requirements of this Order are severable, and Respondents shall comply with each and every provision hereof, notwithstanding the effectiveness of any other provision.

6.21 Incorporation of Plans, Schedules and Reports. All plans, schedules, reports, specifications and other documents that are submitted by Respondent) pursuant to this Order are incorporated in this Order upon DTSC's approval or as modified pursuant to Section 6.7, DTSC Review and Approval, and shall be implemented by Respondents. Any noncompliance with the documents incorporated in this Order shall be deemed a failure or refusal to comply with this Order.

6.22 Modifications. DTSC reserves the right to unilaterally modify this Order. Any

Unilateral ISB Order
April 24, 2017

modification to this Order shall be effective upon the date the modification is signed by DTSC and shall be deemed incorporated in this Order.

6.23 <u>Time Periods</u>. Unless otherwise specified, time periods begin from the Effective Date of this Order and "days" means calendar days.

6.24 <u>Termination and Satisfaction</u>. Except for Respondents' obligations under Sections 5.14, Operation and Maintenance (O&M); 5.15, Five-Year Review; 5.20, Financial Assurance; 6.13 Record Retention; 6.18 Liability for Costs; and 6.19 Payment of Costs, Respondents obligations under this Order shall terminate and be deemed satisfied upon Respondents receipt of written notice from DTSC that Respondents have complied with all the terms of this Order.

6.25 <u>Calendar of Tasks and Schedules</u>. This Section is merely for the convenience of listing in one location the submittals required by this Order. If there is a conflict between the date for a scheduled submittal within this Section and the date within the Section describing the specific requirement, the latter shall govern.

<u>Calendar of Tasks and Schedules</u>

| TASK | SCHEDULE |
|---|---|
| 1. Take Drainage Control Measures; Section 5.1.1(a)(i) | Immediately |
| 2. Identify Project Coordinator; Section 6.1 | Within four (4) days of the Effective Date of this Order |
| 3. Identify and provide credentials for qualified and independent third-party retained to perform the work required by Section 5.1.1.; Section 5.1.1(a) | Within four (4) days of the Effective Date of this Order |
| 4. Submit Workplan to DTSC providing for the removal of liquids from sumps and failing tanks; Section 5.1.1(a)(ii)(1). | Within ten (10) days of the Effective Date of this Order |
| 5. Identify Project Engineer/Geologist; Section 6.2 | Within fifteen (15) days of the Effective Date of this Order |
| 6. Complete removal specified in Workplan prepared in accordance with Section 5.1.1.(a)(ii)(1); Section 5.1.1.(a)(ii)(1) | Within twenty (20) days of the Effective Date of this Order |
| 7. Submit Monthly Summary Reports; Section 6.3 | Within thirty (30) days of the Effective Date of this Order |

Unilateral ISE Order
April 24, 2017

| | |
|---|---|
| 8. Submit to DTSC inventory and Workplan with Schedule; Section 5.1.1(a)(iii) | Within thirty-five (35) days of the Effective Date of this Order |
| 9. Submit RI/FS Workplan; Section 5.2.2 | Within thirty (30) days of the Effective Date of this Order |
| 10. Submit interim screening and evaluation document; Section 5.3 | As requested by DTSC |
| 11. Submit Treatability Studies; Section 5.45 | As required during Site characterization or as requested by DTSC |
| 12. Submit RI Report; Section 5.5 | Per approved RI/FS Workplan Schedule |
| 13. Submit Baseline Risk Assessment; Section 5.6 | Within thirty (30) days, or as required, from submittal of RI Report |
| 14. Submit FR Report; Section 5.7 | Within thirty (30) days from submittal of RI Report |
| 15. Submit Public Participation Plan; Section 5.8 | Within forty (40) days from the Effective Date of this Order |
| 16. Submit and distribute Fact Sheets | For projected or completed key milestones, as specified in approved Public Participation Plan, or when requested by DTSC |
| 17. Submit Initial Study and Checklist; Section 5.9 | Within thirty (30) days after approval of FS Report |
| 18. Submit Draft RAP or Draft RAW; Section 5.10 or 5.11 | Within thirty (30) days after approval of FS Report |
| 19. Submit information needed to prepare Responsiveness Summary | Within ten (10) days of DTSC request |
| 20. Submit Final RAP or RAW | Within fifteen (15) days of receipt of DTSC's comments |
| 21. Submit Remedial Design; Section 5.12 | Within fifteen (15) days of receipt of DTSC's comments |
| 22. Land Use Covenant; Section 5.13 | Within ninety (90) days of approval of Final RAP or Final RAW |
| 23. Submit Implementation Report; Section 5.14 | Within thirty (30) days of completion of filed activities |
| 24. Submit O&M Workplan; Section 5.15 | Within thirty (30) days of DTSC's requests |

Unilateral ISE Order
April 24, 2017

| 25. | Submit Remedial Action Review Workplan; Section 5.16 | Within thirty (30) days before end of five-year period |
|---|---|---|
| 26. | Submit Emergency Response Action Report; Section 5.19 | Within seven (7) days of an emergency response action |
| 27. | Provide copies of sampling, data, and documentation; Section 6.12 | Within seven (7) days of receipt of DTSC's request |
| 28. | Provide prior notice before conducting field sampling; | Inform DTSC seven (7) days in advance of sampling |
| 29. | Maintain central depository of data, reports, documentation; Sections 6.12 and 6.13 and | Minimum of ten (10) years after conclusion of all activities conducted pursuant to this Order |
| 30. | Provide written notice to DTSC before destroying any documentation prepared pursuant to this Order; Section 6.13 | At least six months prior to destroying any documents |

6.26  Parties Bound.  This Order applies to and is binding upon each Respondent, and each Respondent's respective officers, directors, agents, employees, contractors, consultants, receivers, trustees, successors and assignees, including, but not limited to, individuals, partners, and subsidiary and parent corporations.  Respondents shall provide a copy of this Order to all contractors, subcontractors, laboratories, and consultants that are retained to conduct any work performed under this Order within fifteen (15) days after the Effective Date of this Order or the date of retaining their services, whichever is later.  Respondents shall condition any such contracts upon satisfactory compliance with this Order.  Notwithstanding the terms of any contract, Respondents are responsible for compliance with this Order and for ensuring that their respective subsidiaries, employees, contractors, consultants, subcontractors, agents, and attorneys comply with this Order.

6.27  Change in Ownership.  No change in ownership or corporate or partnership status relating to the Site shall in any way alter each Respondent's responsibilities under this Order. No conveyance of title, easement, or other interest in the Site, or a portion of the Site, shall affect each Respondent's obligations under this Order.  Unless DTSC agrees that such obligations may be transferred to a third party, each Respondent shall be responsible for and liable for any failure to carry out all activities required of Respondents by the terms and conditions of this Order, regardless of any Respondent's use of employees, agents, contractors, or consultants to perform any such tasks.  Respondents shall provide a copy of this Order to any subsequent owners or successors before ownership rights or stock or assets in a corporate acquisition are transferred.

Unilateral ISE Order
April 24, 2017

## VII.  NOTICE OF INTENT TO COMPLY

7.  Not later than three (3) days after the Effective Date of this Order, each Respondent shall provide written notice, in accordance with Section 6.5, Submittals of this Order, stating whether or not Respondent will comply with the terms of this Order.  If Respondents, or any one of them, do not unequivocally commit to perform all of the requirements of this Order, they, or each so refusing, shall be deemed to have violated this Order and to have failed or refused to comply with this Order.  Respondents' written notice shall describe, using facts that exist on or prior to the Effective Date of this Order, any "sufficient cause" defenses asserted by Respondents under Health and Safety Code sections 25358.3(a) and 25355.5(a)(1)(B) or the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) section 107(c)(3), 42 U.S.C. section 9607(c)(3).

## VIII.  EFFECTIVE DATE

8.    This Order is final and effective on the date it is served on you (Effective Date).

## IX.  PENALTIES FOR NONCOMPLIANCE

9.  Pursuant to Health and Safety Code sections 25359, 25359.2, 25359.4, and 25367(c), each Respondent may be liable for penalties of up to $25,000 for each day out of compliance with any term or condition set forth in this Order and for punitive damages up to three times the amount of any costs incurred by DTSC due to Respondents' failure to comply. Health and Safety Code section 25359.4.5 provides that a responsible party who complies with this Order, or with another order or agreement concerning the same response actions required by this Order, may seek treble damages from any Respondent who fails or refuses to comply with this Order without sufficient cause.

DATE OF ISSUANCE: 4/24/2017

Janet Naito
Regional Branch Chief
Brownfields and Environmental
Restoration Program
Department of Toxic Substances Control

Unilateral ISE Order
April 24, 2017

33

# Exhibit A

For Assessment Use Only



ASSESSOR'S MAP I

OAKLAND (KELLERSBERGER'S)

# Exhibit B

# E-D COAT
## MAP OF LOCATIONS SEARCHED



KEY:

LOCATION #1: 716 4th Street, Small Rack Line (Line A), Large Rack Line (Line B)

LOCATION #2: 407 Castro Street, Warehouse

LOCATION #3: 411 Castro Street, Shipping and Receiving

LOCATION #4: 715 & 721 4th Street, Old Barrel Line (Line D), Cleaning & Pickling Line (Line E)

LOCATION #5: 725 4th Street, New Automatic Line (Line C), Chem Film Line (Line G)

LOCATION #6: 714 & 718 3rd Street, Waste Treatment Yard

# Exhibit E



   **Department of Toxic Substances Control**   

**Jared Blumenfeld**
Secretary for
Environmental Protection

Meredith Williams, Ph.D.
Acting Director
700 Heinz Avenue
Berkeley, California 94710-2721

**Gavin Newsom**
Governor

November 19, 2019


PERSONAL SERVICE OR CERTIFIED MAIL

410 Brush Street, LLC
c/o Mo Hassen
1417 Everett Street
Alameda, California 94501

715 4th Street, LLC
c/o Mo Hassen
1417 Everett Street
Alameda, California 94501

J & M Real Estate Group, LLC
c/o Marsha Bryant
3535 Peachtree
Atlanta, Georgia 30326

Mireles Investments, LLC
c/o Pedro Mireles
220 Beechnut Drive
Hercules, California 94547

Steppingstone Assets Group, LLC
c/o Tan Tseng
274 Redwood Shores Parkway #105
Redwood City, California 94065

3D Clone Inc. 401(K) Plan and Trust
c/o Tan Tseng
274 Redwood Shores Parkway #105
Redwood City, California 94065

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 2

Samson Gebreselassie
1825 Poggi Street, Apt. #308A
Alameda, California 94501

Yikaalo Gebreselassie
1825 Poggi Street, Apt. #308A
Alameda, California 94501

Yikaalo Gebreselassie
c/o Na'il Benjamin
Attorney
Benjamin Law Group, P.C.
1290 B Street, Suite 314
Hayward, CA 94541

Tan Tseng
525 Breakwater Drive
Redwood City, California 94605

Warren Huan Tseng
525 Breakwater Drive
Redwood City, California 94605

Lisa Rossi, in her individual capacity and as doing business as E-D Coat, Inc.
715 4th Street
Oakland, California 94607

Gerald (Jerry) Rossi, in his individual capacity, as Trustee of Jerry & Patricia S. Rossi
Trust, as Trustee of Frank and Mildred E. Rossi Trust, and as Trustee of Rossi Family
Trust
715 4th Street
Oakland, California 94607

Patricia Rossi, as Trustee of Jerry & Patricia S. Rossi Trust and as Trustee of Rossi
Family Trust
715 4th Street
Oakland, California 94607


NOTICE OF FINAL DETERMINATION OF NONCOMPLIANCE WITH FIRST
AMENDMENT TO IMMINENT AND/OR SUBSTANTIAL ENDANGERMENT
DETERMINATION AND ORDER AND REMEDIAL ACTION ORDER, E-D COAT,
OAKLAND, CALIFORNIA, DOCKET NO. HSA FY 16/17-107

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 3

Dear Sirs and Madams:

On April 24, 2017, the Department of Toxic Substances Control (DTSC) issued an Imminent and/or Substantial Endangerment Determination and Order and Remedial Action Order, Docket No. HSA FY 16/17-107 (Order) to the following parties for the investigation of and cleanup of a release of hazardous substances at the E-D Coat Site located at 715, 716, 721, 725, 726, 732, and 734 4th Street; 714 and 718 3rd Street; property identified as 3rd Street with no street number; 685, 703, 707, 713, and 715 5th Street; property identified as 5th Street with no street number; 410, 414 and 418 Brush Street; properties identified as Brush Street with no street number; and 407 and 411 Castro Street, Oakland, California 94607 (Site):

1. E-D Coat, Inc.;

2. Lisa Rossi, and individual and as having done business as E-D Coat, Inc.;

3. Jerry and Patricia S. Rossi Trust;

4. Gerald (Jerry) Rossi, an individual and Trustee of Jerry & Patricia S. Rossi Trust and Trustee of Frank and Mildred E. Rossi Trust; and

5. Patricia Rossi, Trustee of Jerry & Patricia S. Rossi Trust and Trustee of Rossi Family Trust

(collectively, "Initial Respondents").

On April 8, 2019, DTSC amended the Order by issuing the First Amendment to Imminent and/or Substantial Endangerment Determination and Order and Remedial Action Order (Amended Order) to, among other things, add the following additional parties to the Order:

1. Gerald (Jerry) Rossi, as Trustee of Rossi Family Trust;

2. Patricia Rossi, as Trustee of Rossi Family Trust;

3. Rossi Family Trust;

4. 410 Brush Street, LLC;

5. J&M Real Estate Group, LLC;

6. Mireles Investments, LLC;

7. 715 4th Street LLC;

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 4

8. Steppingstone Assets Group LLC;

9. Samson Gebreselassie, an individual;

10. Yikaalo Gebreselassie, an individual;

11. John Sullivan, an individual;

12. Tan Tseng, an individual, as a joint tenant, and in his capacity as Trustee of 3D Clone Inc., 401 K Plan and Trust;

13. Warren Huan Tseng, as a joint tenant; and

14. 3D Clone Inc., 401 K Plan & Trust

(collectively, "Additional Respondents").

The Amended Order requires, among other things, that the Additional Respondents, as well as the Initial Respondents, perform the following actions:

- Project Engineer/Geologist: Section 6.2 of the Order requires that within fifteen (15) days from the date of the Order is signed by DTSC, Respondents must submit (a) the name and address of the project engineer or geologist chosen by the Respondents and (b) provide the resume of the engineer or geologist and a statement of qualifications of the consulting firm responsible for the work.

- Removal of Liquids from Sumps and Failing Tanks: Section 5.1.1.a.ii.2 of the Order requires that within twenty (20) days of the effective date of the Order, Respondents shall remove all liquids, debris, and other materials from all sumps and tanks at the Site that pose an immediate risk of failure or overflow.

- Remedial Investigation/Feasibility Study (RI/FS) Workplan: Section 5.2.2 of the Order requires within thirty (30) days of the effective date of the Order, Respondents must prepare and submit to DTSC for review and approval a detailed RI/FS Workplan and implementation schedule which covers all the activities necessary to conduct a complete RI/FS of the Site.

- Communication and Coordination Plan (CCP): Section 6.1.1 of the Order requires that within thirty (30) days from the date the Order is signed by DTSC, Respondents shall submit to DTSC for its approval a CCP that specifies the requirements and procedures by which Respondents will communicate and coordinate with one another in carrying out the requirements of the Order.

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 5

- Monthly Summary Reports:  Section 6.3 of the Order requires that within thirty (30) days from the date the Order is signed by DTSC, and on a monthly basis thereafter, Respondents shall submit a Monthly Summary Report.

- Hazardous Waste and Hazardous Materials Inventory and Workplan:  Section 5.1.1.a.iii of the Order requires within thirty-five (35) days of the effective date of the Order, Respondents shall submit to DTSC for review a hazardous waste and hazardous material inventory and workplan with schedule for removal of all hazardous substances from the Site.

Because the documents described above were not submitted and the activities described above were not completed, DTSC issued a Notice of Proposed Determination of Noncompliance with the Amended Order to the following Additional Respondents on the following dates:

- On June 21, 2019, DTSC issued an Amended Notice of Proposed Determination of Noncompliance with the Order to 410 Brush Street, LLC, 715 4th Street LLC, J & M Real Estate Group, LLC, Rossi Family Trust, Samson Gebreselassie, Yikaalo Gebreselassie, John Sullivan, and Warren Tseng (June 21, 2019 Proposed Notice);[1]

- On July 26, 2019, DTSC issued a Notice of Proposed Determination of Noncompliance with the Order to Steppingstone Assets Group, LLC, 3D Clone Inc. 401(K) Plan and Trust, and Tan Tseng (July 26, 2019 Proposed Notice);

- On August 1, 2019, DTSC issued a Notice of Proposed Determination of Noncompliance with the Order to Mireles Investments LLC (August 1, 2019 Proposed Notice); and

- On August 6, 2019, DTSC personally served a Notice of Proposed Determination of Noncompliance with the Order to the Benjamin Law Group, P.C. on behalf of Yikaalo Gebreselassie (August 5, 2019 Proposed Notice).

The Additional Respondents identified in the June 21, 2019 Proposed Notice, July 26, 2019 Proposed Notice, August 1, 2019 Proposed Notice and August 5, 2019 Proposed Notice were required to (1) submit written notice that Additional Respondent would comply with the terms of the Order; (2) provide the name, address, and telephone number of the Project Coordinator; (3) provide the name and address of the project

---

[1] The June 21, 2019 Amended Notice of Proposed Determination of Noncompliance with the Order that was sent via certified mail to Samson Gebreselassie and Yikaalo Gebreselassie was returned to DTSC. As a result, on August 6, 2019, DTSC attempted to personally serve Samson Gebreselassie and Yikaalo Gebreselassie.  When DTSC attempted to serve Yikaalo Gebreselassie, he communicated to DTSC that (1) he had hired the Benjamin Law Group to represent him and that the Benjamin Law Group, P.C. would accept service on his behalf and (2) his brother, Samson Gebreselassie was not currently in the United States.

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 6

engineer or geologist and resume, and statement of qualifications of the consulting firm; (4) provide evidence that all tanks and sumps were evaluated by a qualified person to determine if any are in immediate risk of failure or overflow, and if so provide a schedule to DTSC to remove all liquid, debris and other materials from those tanks and sumps; (5) submit a hazardous waste and hazardous material inventory and Workplan with schedule for removal; and (6) submit a detailed RI/FS Workplan and implementation schedule. The deadlines to complete the necessary actions and respond to DTSC were as follows:

1. 5:00 PM on July 31, 2019 for the Additional Respondents identified in the June 21, 2019 Proposed Notice.

2. 5:00 PM on August 2, 2019 for the Additional Respondents identified in the July 26, 2019 Proposed Notice.

3. 5:00 PM on August 8, 2019 for the Additional Respondents identified in the August 1, 2019 Proposed Notice.

4. 5:00 PM on August 14, 2019 for the Additional Respondents identified in the August 5, 2019 Proposed Notice.

On the other hand, the Additional Respondents could submit, within seven (7) calendar days after receiving their proposed notice, an explanation in writing requesting to modify the Amended Order. The explanation was required to include the reasons for the modification as well as a thorough description of the actual modification and proposed Amended Order amendment language.

In response, DTSC received correspondence on behalf of some of the Additional Respondents, including, but not limited to the following:

- June 26, 2019 phone call from Brian Zagon, Partner, Van Ness Feldman, LLP, representing Tan Tseng individually and on behalf of Steppingstone Assets Group, LLC, 3D Clone 401 K Plan & Trust, and Warren Tseng ("Tseng Parties").

- June 27, 2019 letter from Michael S. Brown, attorney, Brown & Sullivan, LLP, representing 410 Brush Street, LLC and 715 4th Street LLC.

- July 3, 2019 letter from Brian Zagon, Partner, Van Ness Feldman, LLP, representing the Tseng Parties.

- July 3, 2019 email from Lisa Rossi representing the Rossi Family Trust.

- July 27, 2019 email from Brian Zagon, Partner, Van Ness Feldman, LLP, representing the Tseng Parties.

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 7

- August 6, 2019 email from Pedro Mireles representing Mireles Investments LLC.

- August 7, 2019 email from Pedro Mireles representing Mireles Investments LLC.

- August 7, 2019 email from Lisa Rossi representing the Rossi Family Trust.

- August 7, 2019 email from Marsha Bryant, Managing Director, representing J & M Real Estate Group, LLC.

- August 7, 2019 email from Yikaalo Gebreselassie.

- August 19, 2019 letter from Brian Zagon, Partner, Van Ness Feldman, LLP representing the Tseng Parties.

- August 20, 2019 email from Na'il Benjamin, Attorney, Benjamin Law Group, P.C. representing Yikaalo Gebreselassie.

- August 22, 2019 email from Lisa Rossi representing Rossi Family Trust.

- August 22, 2019 email from Pedro Mireles representing Mireles Investments LLC.

- August 23, 2019 email from Marsha Bryant, Managing Director, representing J & M Real Estate Group.

- September 6, 2019 email from Lisa Rossi on behalf of the Rossi Family Trust.

- September 17, 2019 email from Lisa Rossi on behalf of the Rossi Family Trust.

- September 22, 2019 email from Brian Zagon, Partner, Van Ness Feldman, LLP, representing the Tseng Parties.

- October 17, 2019 email from Brian Zagon, Partner, Van Ness Feldman, LLP representing the Tseng Parties.

- November 7, 2019 email from Brian Zagon, Partner, Van Ness Feldman, LLP, representing the Tseng Parties.

None of the above-referenced correspondence indicates that the respective Additional Respondent is taking steps to affirmatively comply with the terms of the Amended Order.

As of the date of this letter, DTSC's records indicate that the Additional Respondents have not performed any of the actions described, i.e., (1) failed to select a project

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 8

engineer or geologist and provide DTSC with the resume of the engineer or geologist
and statement of qualifications of the consulting firm, (2) remove the liquids from sumps
and failing tanks,(3) prepare and submit a RI/FS Workplan, (4) submit a CCP, and (5)
submit monthly reports. Therefore, pursuant to the provisions of Health and Safety
Code section 25355.5(a)(2), DTSC is providing the Additional Respondents with this
written notice that THE DEPARTMENT OF TOXIC SUBSTANCES CONTROL
DETERMINES THAT ALL OF THE ADDITIONAL RESPONDENTS ARE NOT IN
COMPLIANCE WITH THE TERMS OF THE ORDER AND HAVE BEEN IN
NONCOMPLIANCE AS OF THE DATE THAT THE RESPECTIVE PROPOSED
NOTICE OF NONCOMPLIANCE WAS ISSUED TO THE ADDITIONAL
RESPONDENTS.

As a result of your failure to comply with the Amended Order, DTSC may take removal
actions required pursuant to the Amended Order (and Order). In addition, DTSC may
seek cost recovery for all costs incurred, including administrative costs, in connection
with any remedial investigations and remedial actions taken by DTSC. DTSC may also
assess penalties of up to $25,000 for each day you have been or continue to be out of
compliance and for punitive damages up to three times the amount of any costs
incurred by DTSC as a result of your failure to comply with the Amended Order.

It should be noted that previously on June 21, 2017, DTSC issued a notice of
determination of noncompliance with the Order to the Initial Respondents. As of the
date of this letter, the Initial Respondents remain out of compliance with the Order and
face the same liability for noncompliance as described in the previous paragraph.

If you have any questions regarding this letter or the Amended Order, please contact
DTSC project manager, Lynn Nakashima at (510) 540-3839, via email at
Lynn.Nakashima@dtsc.ca.gov, or in writing at:

Lynn Nakashima
Senior Environmental Scientist
Site Mitigation and Restoration Program
Department of Toxic Substances Control
700 Heinz Avenue
Berkeley, CA 94710

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 9

If you are represented by counsel in this matter, your counsel may contact Ms. Brooke O'Hanley Selzer at (510) 540-2914, via email at Brooke.Selzer@dtsc.ca.gov, or in writing at:

>    Brooke Selzer
>    Senior Attorney
>    Office of Legal Counsel
>    Department of Toxic Substances Control
>    700 Heinz Avenue
>    Berkeley, CA 94710

Sincerely,

Julie Pettijohn, MPH, CIH
Environmental Program Manager I
Site Mitigation and Restoration Program – Berkeley Office

cc:    via email

>    Brooke O'Hanley Selzer
>    Senior Attorney
>    Department of Toxic Substances Control
>
>    Lynn Nakashima
>    Senior Environmental Scientist
>    Department of Toxic Substances Control
>
>    Brian Zagon
>    Partner
>    Van Ness Feldman LLP
>
>    Michael S. Brown
>    Attorney
>    Brown & Sullivan, LLP
>
>    Na'il Benjamin
>    Attorney
>    Benjamin Law Group, P.C.

| Certified Mail Nos.: | 410 Brush Street, LLC | 7019 1120 0001 7440 7107 |
|---|---|---|
| | 715 4th Street, LLC | 7019 1120 0001 7440 6858 |
| | J & M Real Estate Group, LLC (continued) | 7019 1120 0001 7440 6865 |

Notice of Final Determination of Noncompliance, E-D Coat, Inc.
November 19, 2019
Page 10

| | |
|---|---|
| Mireles Investments, LLC | 7019 1120 0001 7440 6872 |
| Steppingstone Assets Grp., LLC | 7019 1120 0001 7440 6889 |
| Samson Gebreselassie | 7019 1120 0001 7440 6896 |
| Yikaalo Gebreselassie | 7019 1120 0001 7440 6902 |
| Yikaalo Gebreselassie c/o N. Benjamin | 7019 1120 0001 7440 6919 |
| Tan Tseng | 7019 1120 0001 7440 6926 |
| Warren Huan Tseng | 7019 1120 0001 7440 6933 |
| Lisa Rossi | 7019 1120 0001 7440 6940 |
| Gerald (Jerry) Rossi | 7019 1120 0001 7440 6957 |
| Patricia Rossi | 7019 1120 0001 7440 6964 |
| 3D Clone Inc. 401(K) Plan/Trust | 7019 1120 0001 7440 6971 |